Daniel H. STINGER, Appellant,

v.

STEWART & STEVENSON SERVICES, INC., Appellee.

No. A14-91-00535-CV.

Court of Appeals of Texas, Houston (14th Dist.).

April 30, 1992.

Rehearing Denied May 28, 1992.

James J. Reed, Jr., James M. Whorley, Houston, for appellant.

Gregory N. Jones, Scott G. Burdine, John Roberson, Houston, for appellee.

Before J. CURTISS BROWN, C.J., and DRAUGHN and ELLIS, JJ.

## OPINION

ELLIS, Justice.

This is an appeal from a directed verdict granted in favor of Stewart & Stevenson Services, Inc., appellee. Appellant, Daniel H. Stinger, sues appellee for breach of contract and fraud in connection with an incentive arrangement agreement. We affirm.

Because this is a review of a directed verdict, the following is a recitation of the facts most favorable to appellant. Appellant testified that in 1979 Carsey Manning, the Vice President of Stewart & Stevenson, contacted him regarding an offer for employment. At the time, appellant was working for General Motors in the Aeronautical Engineering department making a salary of $36,000 per year. The reason Stewart & Stevenson wanted appellant as an employee is because they understood he was an expert in gas turbine engines and wanted to start up a gas turbine operation in the industrial or commercial end of their business. Manning told Stinger that Stewart & Stevenson offered relatively low salaries, but fairly high commissions. Manning also indicated that if he would be willing to take employment at Stewart & Stevenson that he would be substantially rewarded in the future for giving up his position at General Motors and could make commissions in the range of $100 to $300,000 annually if he was successful in the gas turbine operations that they were trying to start up.

Appellant accepted appellee's offer and began employment as a manager of gas turbine sales in February of 1979. He received a written two year agreement setting out appellant's base salary of $36,000 and bonus calculated on a set formula for sales profit that could be no less than $7500 per year and no more than twice appellant's salary. Appellant received the base salary for both years and bonuses well over the $7500 minimum.

After appellant's agreement expired on January 31, 1981, appellant's received yearly written commission arrangements from Stewart & Stevenson outlining new terms and conditions for appellant's commissions. Appellant received these arrangements for 1981–2, 1982–3 and 1983–4. None of the new arrangements received by appellant included terms regarding salary. Each arrangement ended with the following paragraph:

## IV. OBJECTIVE OF THIS ARRANGEMENT

This arrangement is an incentive arrangement and is not an employment contract.

It is the intent of this arrangement that the results will be for the mutual benefit of both the Company and the employee as long as the employee is employed by the Company and it is agreed that this arrangement may be modified or changed upwards or downwards at any time at the Company's discretion.

Stinger testified that he understood these final paragraphs to mean that Stewart & Stevenson could modify its agreement up or down at its discretion, but that he thought the commission arrangement guaranteed him a certain set commission. In 1985, appellant himself participated in the committee process by which discretionary commissions were allocated to salesmen at Stewart & Stevenson.

Between March and July of 1984, when discussions were underway concerning commissions for the 1983-84 year, appellant testified that the reviewing committee asked him what he thought about the fact that the turbine group he was in would not receive commissions because of a loss in a job called Sohio. The calculation was based on the following paragraph in the commission arrangement:

If a job generates a workorder loss, the amount of commission will be zero, except at the sole discretion of the Company, a commission may be paid due to the circumstances relating to the job.

Appellant testified that he was involved in the Sohio project, however, he felt it was unfair to allow that job to affect commissions because (1) the job had not been sold by the gas turbine group he was in; and (2) the commission should be zero not a negative number to be subtracted from commissions. After appellant wrote the company a memo outlining his complaints, Stewart & Stevenson made the commission zero, not a negative number, and appellant received a commission of $69,000 plus $1200 to be distributed among other employees in the gas turbine group for the 1983-4 year.

Prior to the expiration of the last written commission arrangement for 1983-84, Manning told appellant that the written arrangement would remain in effect until appellant received a new written arrangement. Manning also told appellant that the committee approved raising the ceiling limitation on his commissions from three times his salary to five times his salary.

In July of 1984, Joe Manning, the President, and Carsey Mannin, who was being promoted to Chief Operating Officer, asked appellant if he would like to be promoted to Assistant Chief Operating Officer. Carsey Manning told appellant that "management had approved a salary of $80,000 annually", but appellant testified that Manning did not indicate when the $80,000 would begin. Appellant accepted the position, but then six to eight weeks after their discussion, complained to Manning that his pay check did not reflect the increase in salary. Manning told appellant that the Chairman of the Board of Stewart & Stevenson did not approve the salary and had instead decided to raise appellant's salary to $65,000. Manning represented to appellant that he would take care of it and get appellant's increased salary but did not specify when.

In 1984 and 1985 Stewart & Stevenson experienced losses in its business. The compensation committee proposed a bonus of $7,500 for appellant for the fiscal year of 1984-1985. Appellant found the amount unsatisfactory. On April 21, 1985, appellant wrote a letter to various officers of appellee and threatened to terminate his employment if he did not receive a larger commission which he believed would better reflect his performance. Manning went back to the committee and had the bonus increased to $25,000. Appellant accepted the check but remained dissatisfied about his bonus.

On May 5, 1985, Tom Langham, President of Stewart & Stevenson, met appellant to discuss his complaints. As a result of these discussions Langham and Stinger reached a new agreement, pursuant to which Stinger was to receive a discretionary $25,000 bonus, a raise to $75,000 per

year, and a promise that appellant and the company officer would meet to work out a new incentive plan subject to the company's approval. Appellant testified that his agreement with Langham contained two additional terms: 1) that the terms set forth above would be met by May 15, 1985 and 2) that his name would at some unspecified time in the future be submitted to the board of directors for consideration as a company officer. Under the second provision, the company was not required to actually make appellant an officer, but was merely obliged to consider him for that promotion. In return for the company's agreement to perform these terms by May 15, 1985, appellant agreed to continue his employment.

Appellant was out of town on May 15, 1985. When he returned to the office around 6:00 or 7:00 o'clock that evening, he saw no written confirmation from the company regarding his conditions for continued employment. As a result, appellant cleaned out his desk that evening and terminated his employment effective May 15, 1985. After appellant's departure he did not receive any checks for commissions. On June 14, 1986 appellant sent a letter to C. Jim Stewart of the Board of Directors of Stewart & Stevenson claiming commissions on sales which were delivered in 1985 and 1986. After sending the letter, appellant spoke with Carsey Manning who indicated that the amount of commissions should be even higher than what appellant had sought. Stewart & Stevenson paid nothing further to appellant and responded by letter that they were not obligated for any commissions on equipment sold prior to appellant's termination.

Appellant subsequently filed suit against the company and sought recovery for additional compensation. He specifically sought: 1) additional salary at the rate of $80,000 per year for the period from July 1984 until May 15, 1985, and 2) additional commissions that he said were due under his "commission arrangement" which he alleged to be a binding contract. He alleged the company's failure to pay the claimed amounts constituted a breach of contract and fraud.

A jury trial commenced on April 1, 1991. At the conclusion of appellant's evidence, appellee moved for directed verdict. Among other things, appellee asserted that the "commission arrangement" upon which Stinger based his claim for commission was by its own terms discretionary with the company, that regardless of the incentive arrangement appellant and Langham reached a new agreement that resolved all disputes concerning commissions, and that the salary increased to $80,000 by Stinger's own admission was not promised for any specific time. The court agreed with the company's arguments and granted the motion for directed verdict.

■ In all four points of error, appellant asserts the trial court erred in granting directed verdict for appellee because fact issues existed as to plaintiff's cause of action for fraud and breach of contract. In an appeal for directed verdict, we view the evidence in a light most favorable to the party against whom the verdict has been directed and disregard all contrary evidence. *Qantel Business Systems, Inc. v. Custom Controls Co.*, 761 S.W.2d 302, 303 (Tex.1988). The question governing review is whether any evidence of probative force exists that raises fact issues on the material questions presented. *Henderson v. Travelers Ins. Co.*, 544 S.W.2d 649, 650 (Tex.1976).

■ In point of error one, appellant argues the trial court erred in granting appellee's motion for directed verdict as to appellant's fraud cause of action. The elements for fraud are:

(1) that a material representation was made;

(2) that it was false;

(3) that, when the speaker made it, he knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion;

(4) that he made it with the intention that it should be acted upon by the party;

(5) that the party acted in reliance upon it;

(6) that he thereby suffered injury.

*Trenholm v. Ratcliff,* 646 S.W.2d 927, 930 (Tex.1983) (citation omitted).

Appellant asserts a fraud cause of action based on the written commission arrangement issued to appellant while employed at Stewart & Stevenson. The first paragraph of the arrangement begins, "You will be paid a commission on sales of all turbine engines and turbine engine equipment made by the Turbine Sales Group." The arrangement then sets down the method of computing commissions. Appellant asserts that because appellee denied it had any obligation to pay appellant commissions on the formula set out in the agreement, there was evidence of fraudulent intent. Appellant further asserts since the final paragraph of the agreement stated that the "arrangement may be modified or changed upwards or downwards at any time at the Company's discretion" was evidence that the company knew that the first paragraph of the agreement "You will be paid ..." was inaccurate and misleading to induce appellant to increase sales without any intent of abiding by the first paragraph of the agreement.

The first issue in analyzing appellant's fraud cause of action is to determine what was the material representation made to appellant. The only representation appellant relies on is the written commission arrangement issued to him in 1983. Although the arrangement states in the first paragraph, "You will be paid a commission" with a specific formula for computation, the arrangement goes on to state situations where commissions will be reduced or cancelled and ends by stating that the arrangement can be modified "upwards or downwards" at the company's discretion. The arrangement, therefore, by its own terms, did not represent to promise appellant very much of anything, except that the company promised to pay commissions based on the stated formula unless it determined it did not want to. The fact that the company issued such an arrangement knowing that it was promising so little does not make it a fraudulent act. In fact, appellant testified that he knew the arrangement for commissions could be modified up or down at the company's discre-

tion, and was involved in the company's committee process for determining commissions. Although it may seem unfair to appellant that the company issued such an arrangement, it was within appellant's power to reject such an arrangement for commissions. Appellant's point of error one is overruled.

In point of error two, appellant contends the trial court erred in granting appellee's motion for directed verdict as to appellant's breach of contract claim regarding commissions. Appellant contends that the commission arrangement was a contractually binding arrangement that appellee would pay appellant commissions based on the plan. Alternatively, appellant contends that if it was unclear whether commissions should be paid, based on the "discretionary" language in the agreement, the patently inconsistent language stating that "You will be paid ...", and the trial testimony, then such ambiguities raised fact issues concerning the parties' intent for the jury's determination.

In construing a written contract the primary concern of an appellate court is to ascertain and to give effect to the intentions of the parties as expressed in the instrument. *R & P Enterprises v. LaGuarta, Gavrel & Kirk, Inc.,* 596 S.W.2d 517, 518 (Tex.1980). To achieve this goal, courts examine the entire writing in an effort to harmonize and give effect to all of the provisions of the contract so that none will be rendered meaningless. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983). No single provision, when taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the entire instrument. *Myers v. Gulf Coat Minerals Management Corp.,* 361 S.W.2d 193, 196 (Tex.1962).

As stated previously in response to point of error one, the commission arrangement made clear in three typed pages that it was not too promising to appellant. This is unlike the first agreement which appellant had with Stewart & Stevenson. Appellee began employment at Stewart & Stevenson with a binding two year contract providing

for appellant's base salary and commission ratio. However, after this contract expired, appellant began working under a new commission arrangement which made no provision regarding salary and made commissions completely discretionary to the company. We disagree with appellant that because one single provision provides "You will be paid ..." that the agreement is ambiguous. Appellant conceded in his testimony that he knew the arrangement could be modified upwards or downwards at the company's discretion. The arrangement when taken as a whole, shows that it is merely an incentive arrangement. As appellant indicated in his testimony, this arrangement allowed commissions even more favorable than the set ratio in the first page of the agreement. That is probably why appellant decided to retain this arrangement in lieu of a set commission arrangement as in the two year contract he obtained when he began employment at Stewart & Stevenson. The downside of the new commission arrangement, of course, is that it left to the company's discretion the decision regarding giving a less commission. The fact that the company decided to act on its discretionary power to appellant's detriment does not make it a breach of contract. Appellant's point of error two is overruled.

In point of error three, appellant reurges that the trial court erred in granting the directed verdict as to appellant's breach of contract claim regarding commissions under the commission arrangement. Appellant contends that the May 5, 1985 modification agreement with Tom Langham did not waive his rights under the commission arrangement. We agree with appellant that the May 5, 1985 negotiations with Tom Langham did not waive his rights under the commission arrangement. The agreement made with Tom Langham was conditioned on appellant's continued employment and appellant decided to terminate his employment on the date of the new agreement's performance. Since the only breach of contract deals with the commission arrangement, and as stated in point of error three, there was no breach, appellant's point of error three is overruled.

In point of error four, appellant contends the trial court erred in granting the directed verdict as to appellant's breach of contract claim regarding salary. Appellant's claim for breach of contract regarding salary is based on an oral representation made by Carsey Manning. It is undisputed that Carsey Manning offered appellant the position of Assistant Chief Operations Officer and stated that "management had approved" a salary of $80,000. Appellant contends that the agreement for this salary was not waived when appellant took a less salary of $65,000 under protest after the company did not approve the $80,000 salary. Appellant further contends that the later negotiations with Tom Langham that he be paid $75,000 by May 15, 1985 did not waive his rights to the $80,000 salary promised.

Even assuming that appellant is correct that he did not waive his rights to the promise for $80,000, appellant's claim for breach of contract does not stand. In order to have a binding contract the essential terms must be sufficiently certain to define the legal obligations of the parties. *Bendalin v. Delgado*, 406 S.W.2d 897, 899 (Tex. 1966). Although appellant understood that management approved a salary of $80,000, Appellant admitted on the stand that Manning made no representation as to when the $80,000 salary would go into effect or for how long. Unlike the two year contract appellant obtained when he started work at Stewart & Stevenson that specified he would receive $36,000 a year for two years after beginning employment, the oral representation made to appellant while an employee specified only that $80,000 salary would go in effect some time after he took the new position with the company, but did not specify at what time or for how long. Since the time frame of approval could have been at any time in the future and for any amount of time, it was too indefinite to be a binding contract. *See Moore v. Dilworth*, 142 Tex. 538, 179 S.W.2d 940 (1944) (failure to specify when note would be paid made contract too indefinite to be enforced). Appellant's point of error four is overruled.

Accordingly, the judgment of the trial court is affirmed.

DRAUGHN, Justice, dissenting.

I respectfully dissent from the majority opinion insofar as it affirms the directed verdict against Appellant Stringer as to his contractual claim for commissions due him under the so-called "Commission Arrangement" document. In my opinion, this written document evidencing the agreement between the parties is inherently ambiguous and conflicting in its terms. That alone precludes a directed verdict against Appellant Stinger. Clearly, material ambiguity in a contract raises a fact question for the jury and cannot support a summary judgment or a directed verdict based on that contract. *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex.1983).

Appellee, Stewart & Stevenson, takes the position that this document is simply an incentive brochure attesting to what the company might pay to Stinger if they feel like it. Whether he sells five dollar's worth of their equipment or five million, they have the discretion to pay him nothing in commissions.

The formal title of this document under which Appellant seeks commissions on the equipment he sold during 1983–84 is:

DANIEL STINGER COMMISSION ARRANGEMENT STEWART & STEVENSON SERVICES, INC.—ENGINE DIVISION EFFECTIVE FOR PERIOD OF 2/1/83 THROUGH 1/31/84

The document, in my opinion, by its own terms refutes the appellee's interpretation. It contains repeated specific language to the effect that a commission will be paid. For example, its first paragraph states:

"*You will be paid a commission* on sales of all turbine engines and turbine engine driven equipment made by the Turbine Sales Group: Mark Axford, Jay Manning and you. Commission paid on Garrett turbine engines and diesel engine driven equipment will be discretionary." (emphasis added).

The first six words of this beginning paragraph could not be more emphatic. It is specific and non-conditional except as to the last sentence, which is inapplicable to the particular sales in this case. Mr. Stringer will be paid a commission, not he "may" or "might" be paid a commission on his sales, as contended by appellee. The words are clear and unfettered in their meaning. Also, the last sentence of this paragraph further refutes appellee's interpretation that payment of any commission is entirely discretionary. If that be so, why should there be specific language providing for discretionary commissions on certain engines sold? At best, the paragraph is ambiguous and conflicting when placed against the backdrop of appellee's interpretation.

But the ambiguity and conflict does not end here. Additional specific commission language is found in other paragraphs throughout the document. For example, Paragraph I.A.2. of this "discretionary" document provides in part:

"In addition, a commission equivalent to 10% of the aggregate income (including loss jobs) *will be paid.*" (emphasis added).

Also, Paragraph II A and E state:

A. "If a job generates a workorder loss, the amount of commission will be zero, except at the sole discretion of the Company, a commission may be paid due to the circumstances relating to the job."

E. "At the end of the 12 month period earned commission balance *will be paid* to the salesman (after deducting any money owed to the Company)." (emphasis added).

If the payment of commissions is entirely discretionary, why this language in Paragraph II A, to distinguish between loss and non-loss sales transactions? This clause, according to appellee's interpretation, seems to be whimsically saying: "We may pay you a commission on your equipment sales, but you won't get anything for sure if there's a loss on the sale, but then again, you might, even then—if we feel like it." Such vague, passive language contrasts starkly with the mandatory language in the following paragraph II E, which states, "commission balance *will be paid ...*".

Again, I find such language ambiguous and conflicting at best; certainly, it is no sound foundation for a directed verdict.

Other paragraphs in the document concerning termination of employment weigh against discretionary commissions:

F. The procedure for paying commissions to salesmen who terminate from the Company's employment during a fiscal year is as follows:

1. Termination by the Employee

Commissions *will be paid* on equipment delivered to the customer up to the date of termination by the employee. Such commissions due upon the date of termination *will be paid* within a reasonable length of time after termination. (emphasis added).

2. Termination by the Company

Same as Item 1,.... In addition, the salesman *will be paid* a commission equivalent to 75% of full rate on equipment sold as of the date of termination but not yet delivered.... (emphasis added).

3. On partially delivered jobs at the time of termination, the salesman *will be paid* on an estimated profit and subsequently adjusted upon final completion of the job. (emphasis added).

These paragraphs speak with declarative, mandatory verbs, "will be paid," and not in discretionary, "may be paid" terms as the appellees suggest. Again it is pertinent to ask, if commission payments are entirely discretionary, then why have these mandatory sounding termination provisions? Why not a simple clause that the employee who quits or is terminated may be paid a commission at the sole discretion of the company?

Appellees rely on language in the last paragraph of the document that refers to this as an incentive arrangement and not an employment contract.

"It is the intent of this arrangement that the results will be for the mutual benefit of both the company and the employee as long as the employee is employed by the company and it is agreed that this arrangement may be modified or changed upwards or downwards at any time at the Company's discretion."

Their reliance is overstated. The inconsistency between this self-serving language and that of the commission-termination provisions, previously referred to, is obvious. If this "arrangement" is effective "as long as the employee is employed by the company," then why the termination provisions, which provide that commissions will be paid to Stinger for sales made after termination? It is difficult to view this "arrangement" as of any mutual benefit to the employee, Stinger. Under the company's interpretation, he is entitled to nothing, neither during employment nor after termination, except, perhaps, the document itself. And to suggest that the discretion to modify the commissions upwards or downwards wipes out all other mandatory language and means that the company does not have to pay one cent in commissions, no matter what, is covertly obscure at best, and blatantly misleading at worst. At the very least, it is, in my opinion, materially ambiguous and conflicting when considered in the context of the other mandatory language, and the trial court erred in granting a directed verdict on it against the appellant.

I would reverse and remand on this contractual point and allow the jury to determine the intent of the parties concerning this written document.