**FINANCIAL REVIEW SERVICES, INC., Appellant,**

v.

**The PRUDENTIAL INSURANCE COMPANY OF AMERICA, Appellee**

No. 14–96–01121–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Sept. 10, 1998.

---

Norman Riedmueller, Houston, for appellants.

Craig S. Wolcott, James J. McConn, Jr., Susan C. Stevenson, Houston, for appellees.

Panel consists of Chief Justice MURPHY and Justices HUDSON and FOWLER.

## MAJORITY OPINION

FOWLER, Justice.

Appellant, Financial Review Services (FRS), sued appellee, The Prudential Insurance Company of America, for breach of contract and tortious interference with contractual and business relationships. A partial summary judgment against FRS was followed by a directed verdict at trial, resulting in a take-nothing judgment in favor of Prudential on all claims. FRS appeals, raising three points of error. We affirm the partial summary judgment, concluding that Prudential owed no duty to FRS to pay any claims, including those at issue in this lawsuit, and affirm the trial court's directed verdict on FRS's breach of contract claim, concluding that FRS failed to present probative evidence that Prudential *breached* an agreement. We reverse and remand FRS's tortious interference claims not disposed of in the summary judgment, because we conclude FRS presented *some* evidence to support these claims.

### Background

FRS went to trial with two causes of action: tortious interference with business and contractual relations and breach of contract. The tortious interference claim had five components: (1) Prudential re-

fused to pay the claims on its insureds; (2) Prudential maligned FRS to its insureds and HCA personnel; (3) Prudential harassed HCA representatives with sham audits and unreasonable, bad faith demands and pressure tactics; (4) "Prudential triggered patient complaints by uselessly stirring up patients under pretexts adopted with no justification;" and (5) Prudential started false rumors about FRS which Prudential knew (or should have known) would reach—and intended to reach— HCA management. Regarding the contract claim, FRS claimed that FRS and Prudential reached an agreement that an audit of some of FRS's work would govern whether Prudential would pay the remainder of FRS's bills. The following facts, plus some additional facts related throughout the remainder of the opinion, form the basis for our conclusions on these issues.

FRS is in the business of auditing hospital bills—after the initial bills have been paid—to determine whether additional amounts are owed for services and supplies that were not initially billed. FRS contracts with hospitals to perform these services in exchange for 50% of all collected "late charge bills." The principals of FRS are its president, Mike Lewis, and its chief financial officer, Sheryl Kapella, who is a nurse. Kapella hired and trained other nurses to work for FRS auditing the bills of its hospital clients. In June 1991, FRS entered into two six-month contracts with hospitals affiliated with Hospital Corporation of America (HCA)—Woman's Hospital of Texas and HCA Medical Center Hospital—known collectively as the HCA Center for Health Excellence (CHE).[1] The contracts were executed by Mike Lewis and

---

1. At that time, FRS already had contracts with two other HCA hospitals not at issue in this suit.

John Gilbert, chief financial officer of the hospitals. Under these two contracts, FRS was appointed as the hospitals' agent to identify, evaluate, bill and collect for services rendered at the hospitals. In January 1992, the contracts were renewed for another six-month period. Before this dispute arose, FRS received payments totaling well over $1 million on the two CHE contracts. In June 1992, FRS entered into an identical six-month contract with another HCA hospital, Rio Grande Regional Hospital.

Prudential, a large medical insurer, was asked to approve for payment some of the bills for which FRS had determined that additional amounts were owed. The dispute at issue in this case centers around a batch of approximately two hundred claims from Woman's Hospital that FRS submitted in bulk to Prudential in the fall of 1991. In response to the FRS late charge bills, Prudential sent form letters, known as explanations of benefits (EOB), to its insureds to advise the covered persons of the status and disposition of the claims. Prudential later sent follow-up letters to its insureds. Prudential also communicated with Gilbert, who had included a letter with the billing stating that the patients had not been billed for the expenses charged. Prudential advised him that it required that the patient first be billed and considered financially liable for the expenses before it could give further consideration to the claims.

Prudential initially denied the claims and sought additional documentation, including the complete medical records for the patients. To resolve the disputed claims, Connie Clark and Liz Allen, Prudential employees, conducted an audit of ten randomly selected sample claims out of ninety claims.[2] While the audit was pending, Clark put a hold on payment of these remaining ninety late charge claims.

Allen conducted an on-site audit at Woman's Hospital on April 27, 1992. Kapella was also present at the audit. Prudential asserts Allen was unable to complete the audit because Woman's Hospital denied her access to the hospital's charge master, the computerized listing of prices for a hospital's services and supplies. Without the charge master, Allen could not determine whether the billed amounts were calculated by the hospital or FRS.[3] In addition, Prudential complains it was not able to obtain the hospital's charging protocols to determine what was included in a particular hospital charge. When the charge master was made available to Prudential in June 1992, the auditors conducted a second on-site audit over several days. They discovered FRS billed for items not included in the hospital's charge master, and it had instead used its own charge master. The hospital used "packaged pricing" or "level charges" for many items, and Prudential claimed FRS improperly billed for items that had been previously included in the hospital's origi-

---

**2.** Originally, there were other claims, but, according to Prudential, many of the claims were for employees of Compaq Computer, who was self-insured and for whom Prudential merely had served as an administrator to process claims before Compaq retained another insurer.

**3.** This was an important question to Prudential, who maintained that it would pay only for services and items on the hospital's charge master. It was not willing to pay for items or services that FRS concluded should have been billed but were not on the charge master. As we note later on, ultimately, the hospital's CEO stated that FRS was not to bill for services or items that were not on the charge master, although the contract between HCA and FRS was not clear on this point. FRS apparently believed it could bill for these items.

nal bills.[4] FRS also billed separately for nursing, and Prudential took the position that nursing charges had been previously included in room and board charges. Prudential also maintained that those matters not listed as separate charges on the hospital's charge master could not be charged to its insureds. As a result of the audit, Prudential reached two important conclusions. First, FRS's late charge claims were not supported by hospital documentation and second, it had made a net overpayment rather than the substantial underpayment claimed by FRS. Based on these conclusions, Prudential ultimately rejected all ninety remaining claims and, thereafter, the HCA hospitals terminated their relationships with FRS. FRS believed Prudential caused the termination, but Prudential disagreed.

Prudential asserts that HCA terminated the relationships with FRS based on patient and physician complaints made to the hospitals' business office. For example, Wanda Morris, patient account manager for Woman's Hospital, testified she received daily calls from patients who were confused as to why they had received a bill two years after their hospital stay, when they thought the bill had been paid. She testified the volume of complaints resulted in an undue burden on her staff. In addition, the record shows complaints to the hospital by patients insured by other companies and patient complaints to the Better Business Bureau.

Judith Novak, the chief executive officer for CHE, first learned of patient complaints in March 1992. Novak testified that (a) the complaints disrupted the hospital, (b) the staff in the business office was unable to do their work, and (c) both patients and physicians were upset. She first met with Gilbert, who had negotiated and signed the contracts with FRS, to try to resolve the issue. She also sent him a memo stating that it was unacceptable for FRS to bill for items not included in the hospitals' charge masters.[5] Kapella also met with Novak to discuss her concerns. Kapella agreed to delete certain items from the late charge bills. Novak instructed FRS not to bill for items that were not hospital charges at the time services were rendered. Novak later decided to stop FRS from sending out further bills or doing any work for CHE other than that related to the ten-case audit. In August 1992, Novak fired Gilbert as chief financial officer of CHE. On October 9, 1992, Novak sent a letter to FRS, terminating CHE's relationship with FRS. She expressly denied that Prudential caused her to terminate the relationship between FRS and CHE.

In the meantime, after FRS had prepared the late charge bills under the contract with the Rio Grande HCA (RGRH) but before the bills had been mailed, William Burns, RGRH's chief executive officer, learned from Novak that Woman's Hospital had a public relations problem with FRS and had terminated its services. Burns put the RGRH late charge billing program with FRS on hold and eventually

4. The practice of billing separately for items included in other charges is described as "unbundling of charges."

5. Kapella sent a memo to Gilbert on March 13, 1992, which stated as follows:
 On March 12, 1992, it was brought to my attention that FRS was charging for items not on our charge master. I find this totally unacceptable and I want you to schedule a meeting with Mike [Lewis] immediately so we can resolve this issue.
 My agreement with FRS was they would go back and review charges and those items not charged for would be billed to the insurance company. This billing of charges that were not on our charge master was not part of my agreement with FRS.

terminated the program before FRS ever sent out any late charge bills. Thus, FRS not only lost business with the two Houston HCA hospitals but also with the Rio Grande HCA.

FRS contends Prudential caused all of this, and that it purposely damaged FRS's business and contractual relations with HCA. As a consequence, FRS filed suit against Prudential for tortious interference with its business and contractual relations with HCA and the three HCA hospitals. As noted previously, FRS asserts Prudential interfered by doing the following: (1) refusing to pay FRS's bills; (2) maligning FRS to patients and HCA personnel; (3) harassing HCA representatives with sham audits and unreasonable, bad faith demands and pressure tactics; (4) triggering patient complaints; and (5) starting false rumors about FRS intended to reach HCA.

Prudential moved for summary judgment, alleging that none of its actions constituted tortious interference and that its actions were legally justified. FRS responded that its cause of action depended on whether Prudential acted with malice, which presented a factual determination for the jury. After Prudential filed its motion, but before the hearing, FRS amended its petition to add a breach of contract claim, based on the alleged agreement that the results of the audit of the bills of ten patients would govern the remainder of the billing dispute. The trial judge denied Prudential's first motion for summary judgment.

Prudential then filed a second motion for summary judgment, renewing its earlier arguments and adding new Texas Supreme Court authority supporting its justification defense. *See Texas Beef Cattle Co. v. Green*, 921 S.W.2d 203, 211–12 (Tex. 1996) (holding that the jury's finding of actual malice was immaterial and did not defeat the justification defense). On the basis of the second motion, the trial court granted a partial summary judgment, which provides in relevant part as follows:

> The Court concludes as a matter of law that Plaintiff has no cause of action for tortious interference for Defendant's failure to pay the claims allegedly owed by Defendant on behalf of its insureds and identified by Plaintiff. The Court concludes that Defendant owed no duty or obligation to Plaintiff to pay claims or to pay the claims at issue in this lawsuit.

> The Court further concludes that Defendant had an absolute right to communicate with its insureds regarding the claims that were billed against the insureds' policies; and that Defendants [sic] were not limited to communications that requested information regarding services rendered and statements of benefits paid; and that Defendants [sic] were not limited to any particular number of communications to their insureds. The Court also concludes that Defendant's communications to its insureds may constitute tortious interference, depending on the content of the communications. In addition, the Court concludes that Defendant had an absolute right to object to the bills, questions [sic] the bills, and to complain generally about the practice of late-charge billing. Whether Defendant's communications to the hospitals could have constituted tortious interference depends on the content of the communications.

The remaining issues—the four types of alleged interference and the breach of contract claim—proceeded to trial before a jury. At the close of the plaintiff's case, the trial court granted Prudential's motion for directed verdict on both the remaining tortious interference claims and the breach of contract claim. This appeal resulted.

## The Partial Summary Judgment

In FRS's first point of error, it contends the trial court erred in granting a partial summary judgment. Our standard for review of a summary judgment granted for a defendant is whether the summary judgment proof establishes, as a matter of law, that there is no genuine issue of material fact as to one or more of the essential elements of the plaintiff's cause of action. *See Lear Siegler, Inc. v. Perez,* 819 S.W.2d 470, 471 (Tex.1991); *Gibbs v. General Motors Corp.,* 450 S.W.2d 827, 828 (Tex.1970). The movant has the burden to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548–49 (Tex.1985). To obtain summary judgment based on an affirmative defense, the defendant must conclusively establish all elements of the affirmative defense. *See Cathey v. Booth,* 900 S.W.2d 339, 341 (Tex. 1995).

As FRS rightly notes, the partial summary judgment merely established the following undisputed facts: (1) Prudential failed to pay claims based on the FRS late charge bills; (2) Prudential communicated with its insureds about the bills; (3) Prudential objected to the bills, questioned and investigated them, and complained both about the procedure used to determine the bill amounts and the practice of late charge billing in general. In its ruling, the trial court effectively found that Prudential's denial of the claims at issue was justified because it had the legal right to deny questionable claims and to communicate with its insureds regarding those bills. As this conclusion presents a question of law, we must, therefore, determine whether the trial court reached a proper legal conclusion. *See, e.g., Friendswood Dev. Co. v. McDade + Co.,* 926 S.W.2d 280, 283 (Tex.1996) (affirming summary judgment where justification defense was conclusively established); *Helena Labs. Corp. v. Snyder,* 886 S.W.2d 767, 768–69 (Tex.1994) (holding that the summary judgment was proper because there is no cause of action for interference with family relationships).

Texas law protects existing and prospective contracts from interference. *See Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 689 (Tex.1989). But, a party alleging tortious interference with a contract must prove the following four elements to sustain its claim: (1) a contract subject to interference exists; (2) the alleged act of interference was willful and intentional; (3) the willful and intentional act proximately caused damage; and (4) actual damage or loss occurred. *See ACS Investors, Inc. v. McLaughlin,* 943 S.W.2d 426, 430 (Tex.1997); *Anthony Pools v. Charles & David, Inc.,* 797 S.W.2d 666, 668 (Tex.App.—Houston [14th Dist.] 1990, writ denied).

The elements of tortious interference with a prospective contract or business relationship are frequently recited as the following: (1) a reasonable probability that the parties would have entered into a contractual relationship; (2) an intentional and malicious act by the defendant that prevented the relationship from occurring, with the purpose of harming the plaintiff; (3) no privilege or justification on defendant's part to do the act; and (4) the existence of actual harm or damage resulting from the defendant's interference. *See Grace v. Zimmerman,* 853 S.W.2d 92, 95 (Tex.App.—Houston [14th Dist.] 1993, no writ); *Exxon Corp. v. Allsup,* 808 S.W.2d 648, 659 (Tex.App.—Corpus Christi 1991, writ denied). The Texas Supreme Court has since held that justification is an affirmative defense to claims of interference with prospective business relations. *See Calvillo v. Gonzalez,* 922 S.W.2d 928, 929 (Tex.1996); *see also Robles v. Consolidated*

*Graphics, Inc.*, 965 S.W.2d 552, 561 n. 11 (Tex.App.—Houston [14th Dist.] 1997, pet. denied). Therefore, rather than being an element of the plaintiff's case, it is now the defendant's burden to prove. *See Calvillo*, 922 S.W.2d at 929; *Robles*, 965 S.W.2d at 561, n. 11.

 Justification is based on either the exercise of (1) one's own legal rights, or (2) a good faith claim to a colorable legal right, even though that claim ultimately proves to be mistaken and, even though the defendant may harbor ill will toward the plaintiff. *See Texas Beef*, 921 S.W.2d at 211. Consequently, if the trial court finds *as a matter of law* that the defendant had a legal right to interfere with a contract, then the defendant has conclusively established the justification defense. If this happens, motivation is irrelevant. *Id.* A jury question is presented only when the court decides that no legal right to interfere exists, but the defendant has nevertheless produced evidence of a good faith, albeit mistaken, belief in a colorable legal right. *Id.* Malice, ill will, or motivation are not relevant factors in determining justification if the defendant acts to assert a legal right. *Id.; Calvillo*, 922 S.W.2d at 929.

Returning to the partial summary judgment, it was properly granted only if the trial court correctly determined that Prudential had more than a colorable legal right, and, instead, had the legal right—as a matter of law—to take the actions that it did. If Prudential had only a colorable legal right, the court could not have granted the summary judgment because the issue of a good faith assertion of a legal right would be a jury question.

 With regard to FRS's complaint that the bills were not paid, we conclude, as did the trial court, that Prudential had the legal right vis a vis FRS not to pay the claims. This is because there is no third party cause of action in Texas for bad faith denial of an insurance claim. *See Transport Ins. Co. v. Faircloth*, 898 S.W.2d 269, 279 (Tex.1995); *see also Maryland Ins. Co. v. Head Indus. Coatings & Services, Inc.*, 938 S.W.2d 27 (Tex.1996) (holding that an insurer owes no duty of good faith and fair dealing to investigate and defend claims by a third party). Therefore, Prudential owes no duty of good faith and fair dealing to FRS and cannot be not liable to FRS for bad faith. [6] For this reason, we reject application of FRS's cited authorities holding that insurers have a duty to deal fairly and in good faith with their insureds. *See Packer v. Travelers Indem. Co.*, 881 S.W.2d 172, 174 (Tex.App.—Houston [1st Dist.] 1994, no writ); *Pioneer Chlor Alkali Co. v. Royal Indem. Co.*, 879 S.W.2d 920, 938 (Tex.App.—Houston [14th Dist.] 1994, no writ).

 If a third party has no legal right to require an insurer to pay its insured's claims, then the third party also cannot

---

**6.** The Texas Supreme Court has recently clarified the standard for recovery in bad faith cases and held that an insurer breaches its duty of good faith and fair dealing by denying a claim when the insurer's liability has become reasonably clear. *See Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 56 (Tex.1997). Evidence establishing only a bona fide coverage dispute does not demonstrate bad faith. *See State Farm Lloyds v. Nicolau*, 951 S.W.2d 444, 448 (Tex.1997); *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 17 (Tex.1994). An insurer cannot insulate itself from bad faith liability by investigating a claim in a manner calculated to construct a pretextual basis for denial. *See Nicolau*, 951 S.W.2d at 448; *National Union Fire Ins. Co. v. Dominguez*, 873 S.W.2d 373, 376 (Tex.1994); *Lyons v. Millers Cas. Ins. Co.*, 866 S.W.2d 597, 601 (Tex.1993). Whether an insurer acted in bad faith because it denied or delayed payment of a claim after its liability became reasonably clear is a fact question. *See Giles*, 950 S.W.2d at 56.

sue the insurer for tortious interference for not paying the bills generated by the insured's medical care. The Fifth Circuit reached this conclusion, holding that a bad faith claim brought by a third party cannot be recast as a tortious interference claim. *See Tacon Mechanical Contractors, Inc. v. Aetna Cas. & Sur. Co.*, 65 F.3d 486, 488 (5th Cir.1995). To recognize FRS's tortious interference claim based on Prudential's failure to pay insurance claims would effectively circumvent the law to permit a bad faith claim by a third party.

On appeal FRS has claimed that Prudential's right to deny payment of the claims depended on the validity of the late charge bills. It argues that since the validity of the late charges was a fact issue, summary judgment was precluded. FRS's argument is misplaced. The validity of the late charge bills did not render its cause of action valid or invalid. The problem with the cause of action was that Prudential owed FRS no duty to fairly and in good faith investigate claims on behalf of its insureds. We hold that the trial court correctly ruled that FRS has no cause of action for tortious interference based on

Prudential's failure to pay claims on behalf of its insureds.

▮▮▮ Nevertheless, FRS may have a claim for tortious interference based on Prudential's communications to both its insureds and the hospitals. Whether it does have a cause of action depends upon their content. As to its insureds, Prudential maintains it has a duty under the Texas Insurance Code to communicate with them to acknowledge receipt of a claim and to advise them of any actions taken with respect to the claim. *See* TEX. INS. CODE ANN. art. 21.55 §§ 2, 3 (Vernon Supp.1998).[7] And, giving truthful information to a third party does not constitute improper interference with contractual relations. *See Robles*, 965 S.W.2d at 561 (citing RESTATEMENT (SECOND) OF TORTS § 772 (1965)). Nonetheless, Prudential does not have an absolute privilege to malign FRS. Instead, Prudential had a qualified privilege that would or would not exist depending on the letter's content. A fact question existed on this issue.

As to the hospitals, Prudential also had the right to notify them as the assignees for payment of the claims by their insureds.[8] Again, however, the privilege is

---

7. The Insurance Code provides in relevant part:

Sec. 2 (a) Except as provided [below], an insurer shall, not later than the 15th day after receipt of notice of a claim or the 30th business day if the insurer is an eligible surplus lines insurer:

(1) acknowledge receipt of the claim;

(2) commence any investigation of the claim; and

(3) request from the claimant all items, statements, and forms that the insurer reasonably believes, at that time, will be required from the claimant. Additional requests may be made if during the investigation of the claim such additional requests are necessary.

\* \* \*

Sec. 3 (a) Except as provided [below], an insurer shall notify a claimant in writing of the acceptance or rejection of the claim not later than the 15th business day after the date the insurer receives all items, statements, and forms required by the insurer, in order to secure final proof of loss.

TEX. INS. CODE ANN. art. 21.55 §§ 2, 3 (Vernon Supp.1998). Article 21.55 applies to "all claims filed with the insurer on or after September 1, 1991." Act of June 6, 1991, 72d Leg., R.S., ch. 242, § 13.09, 1991 Tex. Gen. Laws 939, 1134. A claim filed before September 1, 1991, is governed by the law that existed at the time the claim was filed. *Id.*

8. The record shows the hospitals followed the standard industry practice where patients execute an Assignment of Benefits (AOB) to the hospitals as a condition of admission. Under an AOB, the patient assigns the benefits under any medical policy or insurance plan to the hospital, and the hospital effectively stands in the shoes of the patient in collecting the payment of insurance claims for hospitalization.

qualified. In fact, Prudential conceded in its summary judgment motion, that "probably only a qualified defense of justification" applied to the communications with the hospitals. It nevertheless asserted it established its good faith as a matter of law. We disagree. As stated in *Texas Beef*, a jury question is presented when there is only a good faith belief in a colorable legal right. 921 S.W.2d at 211. In this case, the communications should be evaluated by the fact finder for the truth of their contents as part of the determination of whether Prudential acted in good faith.

 Prudential asserts this analysis is unnecessary because there can be no claim for tortious interference under these facts. We have reviewed Prudential's cited authorities and find them distinguishable.[9] Prudential argues that FRS cannot allege tortious interference because it is the hospitals' agent, and even if Prudential breached an agreement with the hospitals to pay medical claims, FRS cannot recover when it is derivatively harmed by that breach. *See Holloway v. Skinner*, 898 S.W.2d 793, 796 (Tex.1995) (holding that a contracting party's agent or employee acting in the party's interests cannot interfere with the party's contract); *LA & N Interests, Inc. v. Fish*, 864 S.W.2d 745, 748–49 (Tex.App.—Houston [14th Dist.] 1993, no writ) (holding, based on a failure of pleading and proof, that a real estate agent had no cause of action for tortious interference against the buyer when the buyer breached his contract with the broker, thereby denying the agent a commission). However, we find no authority, and Prudential has cited none, holding that a third party such as Prudential, who has a separate

contractual relationship with the principal, may not be liable for tortiously interfering with a second, separate contract between the principal and its agent.

We also conclude that Prudential's authorities, which purport to establish that its actions were absolutely justified, are not controlling. *See Sterner*, 767 S.W.2d at 691 (holding that because there was evidence the defendant's interference in directing a contractor to dismiss an employee was not done in the bona fide exercise of the defendant's rights, the defendant failed to establish its justification defense as a matter of law); *Lee v. Levi Strauss & Co.*, 897 S.W.2d 501, 505 (Tex. App.—El Paso 1995, no writ) (holding that a manufacturer's interference with the employment contracts of a thread supplier's former employees who had performed unsatisfactorily was justified because the manufacturer had a legitimate business interest in the management of its suppliers).

In conclusion, like the trial court, we find no absolute bar to a claim for tortious interference based on these facts. We agree with the court's ruling that FRS cannot allege tortious interference based on Prudential's non-payment of the late charge claims, but that Prudential may be liable based upon the content of its communications to the hospitals and its insureds. Therefore, we overrule point of error one.

### Directed Verdict

 In FRS's second point of error, it asserts that the trial court erred in

---

9. We are also unpersuaded by FRS's citation to factually distinguishable contrary authority, *American Nat'l Petroleum Co. v. Transcontinental Gas Pipe Line Corp.*, 798 S.W.2d 274, 279 (Tex.1990) (holding a pipe line company liable for tortious interference with working interests owners' gas balancing agreements with well operators by breaching its "take or pay" contracts with the owners, coercing the owners through economic pressure to settle outstanding claims).

granting a directed verdict on its tortious interference claims. In reviewing the granting of an instructed verdict, we must determine whether there is any evidence of probative force to raise a fact issue on the material questions presented. *See Szczepanik v. First S. Trust Co.,* 883 S.W.2d 648, 649 (Tex.1994); *Collora v. Navarro,* 574 S.W.2d 65, 68 (Tex.1978). We consider all of the evidence in a light most favorable to the party against whom the verdict was instructed and disregard all contrary evidence and inferences; we give the losing party the benefit of all reasonable inferences created by the evidence. *See White v. Southwestern Bell Tel. Co.,* 651 S.W.2d 260, 262 (Tex.1983). If there is any conflicting evidence of probative value on any theory of recovery, an instructed verdict is improper and the case must be reversed and remanded for jury determination of that issue. *Id.*

 The trial court allowed a claim for interference based on communications by Prudential to the hospitals and its insureds to go forward. FRS's pleadings set out five types of interference committed by Prudential. We have already determined the partial summary judgment correctly disposed of the first one—Prudential's failure to pay FRS's bills.[10]

Secondly, FRS asserts that it provided evidence to support its claim that Prudential maligned FRS to patients and HCA personnel, both orally and in writing. It points to correspondence to patients where Prudential falsely accused FRS of double billing by referring to billing for items that had been "previously considered." Kapella testified to how Prudential maligned FRS to HCA personnel. She said that in her first meeting with Novak, Prudential accused her of billing for items not docu-

mented in the medical records. She testified that she was able to point to the specific page in the records where the disputed items were documented. She testified that she was very upset that the insurance company accused her in front of the hospital administration of double billing or fraudulently billing for undocumented items. She testified she had earlier gone over each item billed on the ten cases audited with Liz Allen and found some mistakes on both the original bills and the late charge bills, but the result was that approximately $300 dollars was still owed on the ten cases.

Thirdly, FRS argues Prudential harassed HCA representatives with sham audits and unreasonable, bad faith demands and pressure tactics. FRS points to several acts by Prudential that support this claim. First, Kapella testified she felt Prudential's audit was a sham. In fact, she originally was under the impression that Liz Allen agreed with the FRS charges and she expected approval for payment shortly. Instead, contrary to her initial impression, the Prudential audit went on over seven months. As another example of bad faith demands, FRS points to Prudential's demand for a copy of each patient's entire medical record, when internal records revealed no intent to pay the bills. These demands forced FRS to send Prudential medical records on hundreds of patients, and sometimes Prudential requested the same patients' records several times. Kapella testified Prudential informed the hospital that thousands of dollars of charges were medically unnecessary. Prudential later denied virtually all FRS's charges. An internal memo showed Prudential demanded access to the hospitals' charge master, although it was aware most hospitals did

---

10. The major focus of the evidence presented at trial was whether the late charges FRS billed were appropriate.

not allow such access. Kapella found that often if the hospital had charged for the same type item on the original bill, Prudential had paid the claim but later denied a similar FRS charge. Prudential did not always use the correct figures from the hospitals' charge master when stating FRS overcharged for items. According to Kapella, Prudential did not seriously consider any FRS charges. FRS's former counsel, Mike Johnston, testified that Prudential's counsel threatened that it would have to bring all the patients whose bills were involved into the lawsuit to force Prudential to pay.

Kapella also testified that Prudential's audit manual showed its policy was to release 80% of the benefits due and hold the remaining pending the audit results, but that it did not follow its own policy on FRS claims. This practice adversely affected the hospitals' cash flow problems. In addition, Kapella testified Prudential denied some of the hospital's original charges based on the audit. She stated that requiring the hospitals to pay back benefits received had a bad effect on her company's relationship with its customers.

FRS also claimed that Prudential pressured the hospitals to stop using FRS by refusing to pay non-FRS bills. According to FRS, this tactic placed a financial strain on the hospitals. Wanda Morris, Woman's Hospital's patient accounts manager, testified she knew of at least three non-late charge accounts on which Prudential withheld payment because of the FRS dispute. She specifically recalled one large Prudential claim of over $100,000 where payment was withheld.

Finally, to show Prudential acted with intent to deny payment from the outset, FRS also introduced into evidence a copy of a memorandum dated November 15, 1991, from Mary Taylor, a Claim Consultant at Prudential, to all Group Health Claim Managers. In relevant part, the memo states:

> Recently we have become aware of a firm, Financial Review Services (FRS), which is providing retrospective reviews for various hospitals. These retrospective reviews involve both in and out patient confinements and range in time period from January 1990 through the present. In most cases, the late charges equal or exceed the original billed amount. Several individuals have contacted FRS and received assurance that the hospitals will not attempt to collect any amounts not paid by the Insurance Company.
>
> As the information in our files indicates the patient is not financially responsible for the late charges, we would suggest handling as follows:
>
> 1) Exclude the charges.
>
> 2) Send out the attached letter to the hospital. It should be sent to the Chief Financial Officer of the hospital with a carbon copy to the insured/member. (Attachment A)
>
> 3) Upon receipt of hospital records and/or notification that the patient has been billed, send out the attached letter to the insured/member. (Attachment B)

Attachment A is a form letter to the chief financial officer of the hospital notifying the hospital that the patient must be billed and considered financially liable for the bill before Prudential will consider the claim. The letter also requested a copy of the complete medial records for the patient. Attachment B is a form letter to be sent to the insured with a questionnaire, which asked the following:

1. Did the hospital agree to accept the insurance payment as full payment for all services? Yes/No

2. If no, have you been billed for the late charges (see attached) not paid by your insurance? Please attach a copy of any billings received.

3. Were all the attached services performed? Yes/No

If no, please explain.

4. Additional Comments:

Kapella testified Prudential did not inform her that it was their position that the bills would not be paid unless the patient had been billed. In addition, she disagreed that the late charge bills exceeded the original bills.

The fourth type of interference FRS alleged was that Prudential used pretexts to purposefully agitate patients and thereby trigger patient complaints. Kapella acknowledged that patient complaints kept pouring in, months after the last bills had been sent in December 1991. The testimony was that most bills are processed from 45 to 90 days after being sent. But, in this case, Prudential prolonged the process by continuing to correspond with the patients beyond the standard EOB letter. For example, Prudential sent its insured what is termed as "delay letters," notifying them that no decision had been reached on the claim. These letters continued to be sent over a period of months. It later wrote that the charges had been previously considered, implying that the charges constituted double billing. Novak testified that this additional allegedly unnecessary correspondence hurt it because hospitals depend on repeat business and do not want their patients to be upset.

■ The last alleged interference was false rumors Prudential started about FRS. However, the main problem with this claim, as FRS points out, is that most of this evidence was excluded. The second problem with this claim that FRS does not point out is that FRS neither alleged a point of error on the exclusion or properly briefed it. *See* Tex. R. App. P. 38.1(h); *Happy Harbor Methodist Home, Inc. v. Cowins,* 903 S.W.2d 884, 886–887 (Tex. App.—Houston [1st Dist.] 1995, no writ). We cannot consider any claimed harm from the exclusion of evidence based on the partial summary judgment order in the absence of properly assigned and briefed error. *See Tacon Mechanical Contractors, Inc. v. Grant Sheet Metal, Inc.,* 889 S.W.2d 666, 671 (Tex.App.—Houston [14th Dist.] 1994, writ denied).

■ In summary, we conclude that this evidence amounts to more than a scintilla of evidence to create an inference of tortious interference on FRS's claims. In spite of this conclusion, Prudential still makes an argument that would negate liability: Prudential claims directed verdict on the tortious interference claims was correct because there is no evidence of causation. We agree that FRS has the burden to show there is some evidence Prudential was the cause in fact of the termination of FRS's contractual relations. Cause in fact cannot be established by mere conjecture, guess, or speculation. *See McClure v. Allied Stores of Texas., Inc.,* 608 S.W.2d 901, 903 (Tex.1980). The test for cause in fact is whether the defendant's conduct was a substantial factor in bringing about the injury without which the harm would not have occurred. *See Prudential Ins. Co. v. Jefferson Associates, Ltd.,* 896 S.W.2d 156, 164 (Tex.1995). Even if the injury would not have happened but for the defendant's conduct, the connection between the defendant and the plaintiff's injuries simply may be too attenuated to constitute legal cause. *See Union Pump v. Allbritton,* 898 S.W.2d 773, 776 (Tex.1995).

■ As with any ultimate fact, circumstantial evidence and the inferences therefrom form a sufficient basis for a finding of causation. *See Russell v. Russell,*

865 S.W.2d 929, 933 (Tex.1993); *Havner v. E–Z Mart Stores, Inc.*, 825 S.W.2d 456, 459 (Tex.1992). The issue here is whether there is any evidence from which reasonable minds could draw an inference that Prudential's conduct was a cause in fact of FRS's injury. *See Havner*, 825 S.W.2d at 459. If the circumstances are consistent with either of two facts, however, and nothing shows that one is more probable than the other, then neither fact can be inferred. *Faircloth*, 898 S.W.2d at 278.

Prudential cites to considerable evidence supporting its contentions that it was not the cause in fact of FRS's troubles with the HCA hospitals. We agree that it produced substantial evidence, but, under our review of a directed verdict, we are to consider only the evidence and inferences supporting the non-movant. That evidence is enough to support an inference that FRS's contractual relations with the hospitals were terminated based on pressure from Prudential. For example, Lewis, FRS's president, wrote in an internal memo in March 1992, "Ms. Novak's unilateral abrogation of our contract because of pressure from Prudential will be quite costly if she does not allow us to continue." A letter from Gilbert to Lewis in October 1992 states "Joey Jacobs informed me that an employee of Prudential Insurance Company was spreading the word that Financial Review Services (FRS) has performed a late charge audit at HCA Woman's Hospital in Houston, Texas and that FRS was double billing for charges and billing for charges that Woman's Hospital normally did not bill. Due to the allegations being made by Prudential, Joey Jacobs stated that Joe DiLorenzo made the decision to prohibit HCA hospitals in the Western Region from doing any business with

FRS." FRS also points to a phone call by Ron Betta, an HCA business manager in Florida, to Jacobs in HCA's Western Group. Betta reported that "Prudential had some concerns about rebills" from CHE.[11] Jacobs sent an e-mail to Michael Choate, chief financial officer of RGRH, in October 1992, which stated: "FRS is a company that will review patient bills for under and missing charges. Do not use this firm. If you should have any questions please call me." The e-mail was copied to all CFO's in the HCA Western Region.

Kapella testified that during the initial audit, she and Allen discussed late charge firms in general. Allen commented to her that Prudential "would like to see all firms like ours [FRS] go out of business."

Mike Johnston, the hospitals' attorney who also represented FRS, attempted to collect the late charge bills from Prudential based on a contingent fee arrangement. He testified that the hospitals had never expressed displeasure with FRS's work and the only complaint was the negative public relations problem. In fact, Novak had offered Kapella a job at the hospital. Furthermore, the hospital never returned any of the funds paid by insurers on FRS late charge bills. Johnston testified that the hospitals' administrators expressed their concerns to him about Prudential's nonpayment or delayed payment of other claims, apart from the FRS late charges. He also testified that neither he nor his clients were aware that Prudential had sent letters to its insureds informing them that *all* the charges included in the late charge bills had been previously considered. He testified that when Novak informed Prudential of her concerns about patient complaints, Larry Nettles, Prudential's attorney, stated that,

---

**11.** Prudential asserts Betta repeated what he had heard from another independent contrac-

tor audit company, not from Prudential.

before Prudential would pay the claims, all the patients would be required to be brought into the lawsuit. By letter dated April 26, 1993, Novak informed him that the hospitals had "decided not to pursue the Prudential matter related to Financial Review Services audit." Johnston testified he did nothing further on behalf of FRS because the claims were those of the two hospitals and FRS "could not do anything unilaterally." He subsequently notified Prudential that the hospitals decided not to pursue the claims. He wrote, "I hope this will foster better relations between the hospital and Prudential with respect to timely payment of claims in the future."

John Gilbert, CHE's former chief financial officer, testified that after Novak terminated him, he signed a contract with FRS to receive 10% of FRS collections for hospitals that he arranged to hire FRS. He approached six HCA hospitals, but had no success. When he got the "cold shoulder," he learned that there was word out that the hospitals should not deal with FRS. He later had success with a former HCA hospital and other non-HCA hospitals.

After disregarding the evidence supporting the directed verdict, as we must under the appropriate standard, we conclude that there is at least a reasonable inference sufficient to raise a fact issue as to whether Prudential's actions, primarily through its communications, were a substantial factor in causing the hospitals to terminate their contractual relations with FRS. We hold the trial court erred in directing a verdict against FRS on its tortious interference claims. Therefore, we sustain point of error two.

■ In its third point of error, FRS asserts the trial court erred in directing a verdict on its contract claim. FRS alleged that Prudential breached the parties' agreement that the outcome of the ten-

case sample audit would govern the processing of the balance of FRS's outstanding late charge bills from CHE. In its oral motion for directed verdict, Prudential asserted that no agreement was proved; that is, there was no evidence of a mutual understanding and no evidence of consideration. In addition, it asserted there was no breach. There is no evidence in the form of written documents from Prudential that it consented to be bound to the agreement FRS alleges.

■ To determine whether a party consented to the terms of the agreement, we must rely on objective standards of what was said and done and not upon a party's subjective state of mind. *See Gordin v. Shuler*, 704 S.W.2d 403, 407 (Tex. App.—Dallas 1985, writ ref'd n.r.e.). The terms of an oral contract must be clear, certain and definite. *See Gannon v. Baker*, 830 S.W.2d 706, 709 (Tex.App.—Houston [1st Dist.] 1992, writ denied). If an alleged oral agreement is so indefinite that it is impossible for a court to fix the legal obligations and liabilities of the parties, it cannot constitute an enforceable contract. *Id.; see also Stinger v. Stewart & Stevenson Servs., Inc.*, 830 S.W.2d 715, 720 (Tex. App.—Houston [14th Dist.] 1992, writ denied).

However, even if there is some evidence to support the existence of an agreement to pay all the late charges based on the outcome of the ten-case audit, FRS was unable to provide evidence that this alleged agreement was breached. FRS failed to establish that the ten claims were resolved favorably to it, thereby triggering Prudential's obligation to pay the rest of the claims. The results of the ten-case audit are not clear; the review of the charges continued for at least seven months. Kapella admitted, "the audit was never per se finalized. This kept going on and on and on." Kapella also testified she

received three different audit reports, with the third one showing all FRS charges were disallowed. Even though the audited records for one or two patients may have shown FRS undercharged, Prudential asserted the *net* of all ten cases showed that Prudential had overpaid, and it denied the claims. In short, FRS was unable to provide any probative evidence that Prudential breached such an agreement. We hold the trial court correctly directed a verdict against FRS on its breach of contract claim. Accordingly, point of error three is overruled.

In conclusion, we affirm the partial summary judgment entered below, and we affirm the directed verdict on FRS's breach of contract claim. We reverse the directed verdict on the tortious interference claims and remand those causes of action for proceedings consistent with this opinion.

HUDSON, Justice, dissenting.

When appellant generated and transmitted invoices to appellee's policyholders, appellee was legally obliged to accept or reject such claims in a timely manner. TEX. INS. CODE ANN. art. 21.55 (Vernon Supp. 1998). After conducting an investigation, appellee concluded the bills were either unfounded or had previously been paid. Accordingly, appellee rejected the claims, notified both its policyholders and the affected hospitals, and set forth its reasons for rejection. Appellee contends appellant's actions tortiously interfered with its contractual relations with a number of hospitals.

Justification is an affirmative defense to tortious interference with contractual relations. *See Texas Beef Cattle Co. v. Green,* 921 S.W.2d 203, 211 (Tex.1996). It is based on either the exercise of (1) one's own legal rights or (2) a good-faith claim to a colorable legal right, even though that claim ultimately proves to be mistaken. Here,

appellee was statutorily required to make a speedy decision on whether or not to pay the claims. When it rejected the claims, I believe appellee also had to provide some explanation for the rejection. Because I believe appellee established, as a matter of law, its affirmative defense of justification, I respectfully dissent.