**Affirmed and Opinion filed October 25, 2018.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-16-01020-CV

---

**ARTURO GUAJARDO INDIVIDUALLY AND DERIVATIVELY AS A SHAREHOLDER, MEMBER OR PARTY IN BUYER DEVELOPMENT SERVICES, INC. A.K.A. IMPROVE MY CREDIT USA,**
Appellant/Cross-Appellee

**V.**

**TROY HITT, JOE ORSAK, RANDALL CHESNUTT, AND BUYER DEVELOPMENT SERVICES, INC., Appellees/Cross-Appellants**

---

**On Appeal from the 152nd District Court
Harris County, Texas
Trial Court Cause No. 2015-04657**

---

## O P I N I O N

Appellant Arturo Guajardo, one of four shareholders in a credit repair company, obtained a jury verdict in his favor on breach of contract and breach of fiduciary duty claims against appellees, the other three shareholders in the company. The trial court granted appellees a judgment notwithstanding the verdict and rendered a final judgment

that Guajardo take nothing. On appeal, Guajardo contends that the trial court erred in granting the JNOV and seeks reversal and rendition of a judgment consistent with the jury's findings. By way of a cross-appeal, appellees contend that the trial court erred in failing to grant them attorney's fees as the prevailing parties on Guajardo's declaratory judgment action. We affirm.

## I. FACTUAL BACKGROUND

In 2009, Arturo Guajardo, Joe Orsak, and Randall Chesnutt decided to jointly purchase and operate a credit repair business called Buyer Development Services, Inc. (BDS). The next year, they met Troy Hitt, who had his own credit repair business known as My Credit Repair Store. Guajardo, Orsak, Chesnutt, and Hitt decided that it would be mutually beneficial to combine their businesses, so they agreed that My Credit Repair Store's business would be transferred to BDS and then ownership of BDS would be divided equally among the four owners.

Guajardo, Orsak, Chesnutt, and Hitt memorialized their agreement in an Ownership and Asset Purchase Agreement effective September 1, 2010. Because Hitt brought clients and other valuable assets to the merger, Hitt also negotiated an employment agreement with BDS. The employment agreement provided that Hitt would be Vice President of Sales and would receive a guaranteed salary of $10,000.00 per month for three years.[1] Guajardo, Orsak, and Chesnutt did not have employment agreements, but each of them were paid $8,000.00 per month. Each owner worked daily in the business and served as a director of BDS. Guajardo also worked part time as a flight attendant at an airline mainly because the job provided health insurance for his family.

In October 2011, Guajardo, Orsak, Chesnutt, Hitt, and BDS executed a

---

[1] The agreement as to Hitt's salary for three years also is reflected in the Ownership and Asset Purchase Agreement.

Shareholder Agreement addressing issues specific to the ownership, disposition, and transfer of shares of stock and other matters. Relevant here, the Shareholder Agreement included a priority list structuring the order in which BDS's expenses, compensation, and distributions would be paid:

**ARTICLE XV.**
**Expenses, Compensation and Distributions**

**A.     Use of Funds.** All gross monetary receipts of [BDS] after the date of this agreement shall be used in the following manner:

1.     First, to cover current expenses owed by [BDS] to persons who are not owners/shareholders of [BDS]. For the purposes of this Agreement, the term "expenses" includes, but is not limited to taxes, rent, costs of computers and other equipment/supplies, salaries of employees who are not Shareholders of [BDS], insurance, and other general administrative costs or necessary operating expenses.

2.     Second, to the base salaries of Shareholders, in amounts determined by unanimous consent of the Shareholders. Notwithstanding the foregoing, for the first thirty-six (36) months after the effective date of this Agreement or until [BDS's] total gross revenues meet or exceed One Million Five Hundred Thousand Dollars ($1,500,000.00) over a consecutive twelve-month period, whichever occurs first (the "Maturation Date"), the Shareholders agree that Troy Hitt's base salary shall be a minimum of Ten Thousand Dollars ($10.000.00) per month.

3.     Third, to the repayment of loans to [BDS] from persons who are Shareholders of [BDS].

4.     Fourth, to reinvestment of profits into [BDS's] treasury with the goal of maintaining sufficient operating reserve in an amount to be determined by majority consent of the Shareholders.

5.     Fifth, prior to the Maturation, excess funds shall be used to gross up the salaries of Randall Chesnutt, Arturo Guajardo, and Joe Orsak on an annual basis until their gross salary equals Troy Hitt's base salary (the "Shareholder Salary Equalization Point"). Any remaining profits after the Shareholder Salary Equalization Point shall be distributed in equal portions to all Shareholders in accordance with their ownership percentages. After the Maturation Date, all profits shall be distributed to all owners in accordance with their ownership percentages.

3

Like the Shareholder Agreement, the Ownership and Asset Purchase Agreement also contained a priority list providing, for example, that second priority "shall be given to the base salaries of the Owners, in amounts determined by unanimous consent of the Owners." Nothing in the Shareholder Agreement expressly indicated that it was intended to supersede the Ownership and Asset Purchase Agreement, and neither agreement was expressly amended, modified, or terminated.

In January 2012, the owners asked their certified public accountant, Wallace Williams, to prepare a study to evaluate the company structure of BDS against comparable market peers in similar businesses. Among other things, the purpose of the study was to develop correct titles and salaries for the executive positions as well as comprehensive job descriptions. Vernon Johnson, an employee of Williams, worked on the study. Initially, Johnson contemplated five executive positions: Chief Executive Officer, Chief Operating Officer, Director of Sales, Director of Marketing, and Director of Customer Support.

When the study's recommendations were presented, Guajardo disagreed with its conclusions concerning salary structure, which contemplated that Chesnutt and Hitt would receive greater pay while Guajardo and Orsak would receive less. The study also recommended only three director positions rather than one for each owner. Guajardo and the other owners argued about Guajardo's unwillingness to agree to the study's recommendations.

Around the same time, a series of events unfolded that that would later become the subject of conflicting testimony among the four owners at trial. According to Guajardo, during a marketing meeting with Hitt and Orsak in late March, Guajardo became concerned that he was generating fewer leads or referrals than the other owners and suggested that someone with more experience be hired to replace him as a marketing representative so that he could work in other areas of the business where he

believed he could be more effective. Guajardo offered to train the new person, and Orsak and Hitt appeared to agree with his suggestion. Orsak and Hitt then quickly left the office without letting anyone know where they were going, and Guajardo later learned that Orsak and Hitt met with Chesnutt. Shortly after that, Chesnutt met separately with Guajardo and told Guajardo that since he was not going to be working in the marketing representative position he would no longer be paid a salary. Guajardo and Chesnutt argued. Guajardo told Chesnutt that he wanted to continue working for the company.

On April 3, 2012, Hitt called Guajardo into a conference room and conducted an "exit interview" with him. According to Guajardo, Hitt told Guajardo that his services were no longer needed, and they were letting him go. Guajardo became very upset and told Hitt that he was not quitting, he was merely changing positions. Guajardo then went back to his office and worked for the rest of the day. When he returned to work the next day, some of his office furnishings and accessories, including his desk chair, had been removed and put in other owners' offices. Guajardo nevertheless continued coming to the office and going to company events. Eventually, however, Guajardo's email and software access were discontinued, and he received his last paycheck on April 6, 2012. Guajardo realized that he had to go back to working full time at his job as a flight attendant so that he could provide for his family.

Even though Guajardo was no longer working at BDS, he remained a shareholder of the company. On April 25, 2012, BDS held a board of directors' meeting at which the four directors—Orsak, Hitt, Chesnutt, and Guajardo—were present. Meeting minutes reflect that during the meeting, a salary structure was proposed for several positions in the company, including the following:

> 6. Business Development Rep. $36,000 - $42,000 base plus commission and bonuses

7. Director o[f] Business Development $60,000 base plus commission & bonuses

8. Director of Operations $80,000 base plus commission and bonuses

    1. Current structure for [Hitt] as acting DOO is $120,000 base plus bonuses and distribution

9. Executive Director $96,000 base plus bonuses.

The minutes recite that "[up]on a motion duly made, seconded and unanimously carried, all salaries approved and effective next pay period." The minutes were signed by Orsak, Hitt, and Chesnutt, but not by Guajardo. According to Guajardo, he agreed to the salary structure for the stated positions, but he did not agree to the lack of a salary for himself and indicated his disagreement by not signing the minutes.

Later that year, Guajardo hired an attorney to determine what his rights were and whether his business partners were violating their contracts with him. Guajardo's attorney requested company documents from Chesnutt on Guajardo's behalf. In response, Chesnutt sent several documents, including one document consisting of a page from Hitt's employment agreement and a page from the superseded Partnership Agreement. When Guajardo's attorney requested complete copies of the two agreements, Chesnutt insisted that the two mismatched pages constituted Hitt's full employment agreement and that there was no such document as a partnership agreement.

In 2013, Guajardo learned from Wallace Williams that Chesnutt, Hitt, and Orsak had been giving themselves bonuses and commissions without Guajardo's consent as to dollar amounts. Guajardo became concerned that when Chesnutt, Hitt, and Orsak paid themselves bonuses and commissions, they were distributing corporate profits without Guajardo's consent and ultimately reducing Guajardo's 25% of those profits.

Guajardo also questioned BDS's use of funds to pay for an apartment regularly

6

used by Chesnutt in Chicago, where Chesnutt's young daughter lived with her mother. The board of directors, including Guajardo, had voted to test expanding BDS's business into the Chicago area, and Chesnutt's marketing efforts were to be evaluated every ninety days and terminated if not worthwhile. Guajardo was not provided with any information in response to his inquiries about the status of the Chicago expansion and whether it generated revenue.

In January 2015, Guajardo filed suit against Hitt, Orsak, Chesnutt, and BDS. Relevant here, Guajardo alleged breach of contract against the defendants for failing to pay him $8,000.00 per month from May 2012 "to the present" as unanimously agreed in the Ownership and Asset Purchase Agreement and the Shareholder Agreement. Guajardo alleged breach of fiduciary duty derivatively on behalf of BDS against all the defendants based on their disbursement of unauthorized bonuses and commissions to themselves, and against Chesnutt based on his use of company funds to pay for his personal expenses in connection with his travel to Chicago to see his daughter. Guajardo also made a general request for declaratory judgment as to the rights, duties, meaning, and effect of the attached corporate documents, including Hitt's employment agreement.

Guajardo's contract and fiduciary duty claims were tried to a jury over four days in July 2016. By a vote of ten to two, the jury found in Guajardo's favor. Guajardo filed a motion for entry of judgment. In response, Hitt, Orsak, and Chesnutt moved for JNOV asserting numerous grounds. On November 22, 2016, the trial court granted the motion for JNOV without specifying the basis for its ruling and rendered a final judgment denying recovery to all parties.

## II. ANALYSIS OF GUAJARDO'S ISSUES

Guajardo raises two issues on appeal: (1) the trial court erred in granting the motion for JNOV on any of the grounds asserted by Hitt, Orsak, and Chesnutt; and (2)

Guajardo is entitled to reversal and rendition of judgment consistent with the jury's findings that he was entitled to breach of contract damages of $298,885.00, breach of fiduciary duty damages of $71,250.00, and attorney's fees. We first consider whether the trial court erred in granting the JNOV as to the contract claim and then turn to whether the trial court erred in granting the JNOV as to the fiduciary duty claim. We consider the evidence and JNOV grounds necessary to resolve the appeal. *See* Tex. R. App. P. 47.1.

**A.      Standard of Review**

We review the trial court's ruling on a motion for JNOV under the same standard used for any motion that would render judgment as a matter of law. *See Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005)). This standard requires that we credit evidence favoring the jury verdict if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *Id.* We view the evidence presented in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the movant. *City of Keller*, 168 S.W.3d at 824. To the extent that the trial court's ruling was based on a pure question of law, our review is de novo. *See In re Humphreys*, 880 S.W.2d 402, 404 (Tex. 1994).

**B.      The JNOV on Guajardo's Breach of Contract Claim**

Guajardo first challenges the trial court's grant of the JNOV on his breach of contract claim against Hitt, Orsak, and Chesnutt.

### 1.      *The evidence presented at trial*

At trial, Guajardo's position was that he, Hitt, Orsak, and Chesnutt unanimously agreed that Guajardo would be paid a salary of $8,000.00 per month and that Hitt, Orsak, and Chesnutt breached the agreement when they stopped paying Guajardo

8

without his consent. Guajardo claimed that this agreement was based on the provision in paragraph A.2 of the Shareholder Agreement's priority list that "the base salaries of Shareholders" would be "determined by unanimous consent." Because the Shareholder Agreement does not specify a dollar amount for base salaries other than Hitt's, Guajardo testified that the shareholders orally agreed that Guajardo, Chesnutt, and Orsak would be paid $8,000.00 per month. The evidence showed that from October 2010 to April 2012, Guajardo received a salary of $8,000.00 per month.

The primary disputed fact issue was whether Guajardo chose to stop working at BDS or whether he was fired.[2] The defense position was that Guajardo voluntarily left BDS and chose not to be employed there anymore, but Guajardo testified that he was asked to leave the company and did not resign or voluntarily leave. Guajardo explained that, as an owner of BDS, he felt like his business partners had "broken a promise" and violated their business contract with him because he wanted to continue working for BDS:

> Q.     [Defense Counsel:] My question is: Do you — did their promise include paying you while you worked full time — paying you a salary while you worked full time somewhere else?
>
> A.     [Guajardo:] The promise was to have me working at Buyer Development Services. The end result was me having to go back to work for United Airlines because I did not have an income from Buyer Development Services anymore because they stopped paying me.
>
> Q.     And it's because you stopped working?
>
> A.     No. That's not what I did. I continued to work there. I never resigned from Buyer Development Services. . . . I only stepped out of the position . . . to be able to help the Company out to be able to find someone that would be able to do a better job in the Marketing Rep Department.

---

[2] Article XII of the Shareholder Agreement provides that, with minor exceptions, "[if] a Shareholder's employment with [BDS] is voluntarily terminated for any reason other than death, disability or retirement, such Shareholder shall cease to be a party to this agreement."

. . .

> Q.     Okay. So, were you fired by Troy Hitt from the role of Marketing Rep at Buyer Development Services?
>
> A.     I was asked to leave. I was asked to — that my services were never — I was told my services were no longer needed.

According to Guajardo, all the shareholders had "planned to work in the business forever until we replaced ourselves." And, even though only Hitt had an employment agreement, Guajardo testified that it was "just automatically assumed that we all have positions." But Guajardo admitted that there was "no guarantee" of employment in the written documents.

Hitt testified that Guajardo chose to leave the company. Hitt also denied asking Guajardo to leave the company, although he was shown an email he wrote to Guajardo in which Hitt stated that "asking you to leave [was] the toughest" decision he had to make in his role at the company. According to Hitt, about a week before the exit interview Guajardo expressed concern that he would have to put in more hours at the airline to compensate for the decrease in his pay under the new salary and commission structure that had been proposed, and Guajardo believed that it would be best for the company if he stepped out of the marketing representative position. Similarly, Orsak testified that based on their regular discussions about the proposed bonus and commission structure and Guajardo's production level, Orsak believed that Guajardo left the company because he concluded that he was not going to be able to generate the income he wanted.

The parties also disputed whether Guajardo was entitled to a salary when he was no longer actively employed by the company. Hitt, Orsak, and Chesnutt testified that the Shareholder Agreement contemplated that that shareholders would be paid salaries for performing work for the company and would receive distributions for being shareholders, but they would not be paid a salary merely for being a shareholder. In

10

contrast, Guajardo took the position that he was entitled to receive the salary of $8,000.00 per month until all the shareholders unanimously agreed to change their salaries, as he explained on cross-examination:

> Q.  [Defense Counsel:] So, it is your interpretation of the documents that, regardless of what you planned and regardless of what happened afterwards, the salary should remain the same regardless  of whether anyone put [in] any work?
>
> A.  [Guajardo:] According to the contracts that we have in place, that is exactly the way it is set. We all agreed upon that.
>
> A.  Yes.
>
> Q.  Okay. Based on your interpretation of the how [sic] Buyer Development Services should work under the contract, should there be any benefits for people who put in more work to [sic] the Company than other people?
>
> A.  Not without unanimous consent.
>
> Q.  So, if one person who decided not to do any work, decided not to change the payment structure for people who were doing excess work, there should be no change; is that correct.
>
> A.  Not without unanimous consent.
>
> . . .
>
> Q.  When you talk about unanimous consent, it's really about whether you decide you want to get $8,000. We know they don't want to pay you $8,000 a month. It's only really up to you. But, if you want to receive $8,000 a month for the rest of your life without doing any work at Buyer Development Service[s], it's up to you to decide that; is that correct?
>
> A.  Well, if you remember we all unanimously decided what to pay ourselves.
>
> Q.  And. So if three out of four say, no, you shouldn't receive that, it's only up to you to change that; is that correct?
>
> A.  That would be correct. And the same thing would go if Joe or Randall wanted to change their salary or Troy, then it would be — it would have to be unanimous.

Guajardo agreed that if he continued to receive $8,000.00 per month for the next thirty years, he would receive another $3 million while not working at BDS.

On redirect, Guajardo clarified that he was not requesting $3 million. Instead, Guajardo was asking the jury to award him his bi-weekly net pay of $3,053.50 from the date he was terminated, April 2012, to the time of trial in July 2016, totaling $335,885.00. The jury found in favor of Guajardo and awarded damages of $296,885.00.

### 2. *Legally insufficient evidence of an enforceable contract*

The defendants moved for JNOV on Guajardo's breach of contract claim on several grounds, including the ground that Guajardo presented no evidence of either an oral or written contract with the terms Guajardo alleged.[3] Specifically, the defendants asserted that that there was no evidence of an enforceable contract to pay Guajardo a salary of $8,000.00 per month indefinitely, or any evidence that the individual defendants agreed to such a contract on either a personal level or as corporate officers. The defendants argued that "a 'meeting of the minds' must exist among *all* parties to a contract regarding the amount, duration, and other key factors to create an enforceable agreement." *See, e.g.*, *Baroid Equip., Inc. v. Odeco Drilling Inc.*, 184 S.W.3d 1, 17 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). Absent a lawfully binding contract, the defendants claimed, Guajardo had no right to recover any damages. We agree and affirm the trial court's grant of JNOV as to Guajardo's contract claim on this basis.

To form a binding contract, the minds of the parties must meet with respect to the subject matter of the agreement and all its essential terms. *Argo Data Res. Corp. v.*

---

[3] The defendants also moved for JNOV on Guajardo's contract claim on the grounds that the payment responsibilities always rested with BDS; Guajardo did not plead or present evidence to support piercing the corporate veil; no basis existed for conspiratorial responsibility; and the contractual damages finding was contrary to the law and evidence presented at trial.

*Shagrithaya*, 380 S.W.3d 249, 274 (Tex. App.—Dallas 2012, pet. denied); *Parker Drilling Co. v. Romfor Supply Co.*, 316 S.W.3d 68, 75 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). The parties' assent must comprehend the whole proposition, and the agreement must comprise all the terms that they intend to introduce into it. *Argo Data Res. Corp.*, 380 S.W.3d at 274. The essential terms of the agreement must be agreed upon before a contract may be enforced by the court. *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992); *see Stinger v. Stewart & Stevenson Servs., Inc.*, 830 S.W.2d 715, 720 (Tex. App.—Houston [14th Dist.] 1992, writ denied). Whether an alleged agreement is legally enforceable is a question of law. *Parker Drilling*, 316 S.W.3d at 72.

As the record reflects, Guajardo's breach of contract claim was based on an alleged agreement among the shareholders that Guajardo would be paid a base salary of $8,000.00 per month indefinitely whether he continued to work at BDS or not. But the jury was only asked to find whether Guajardo, Hitt, Orsak, and Chesnutt "agree[d] that Art Guajardo would be paid $8,000.00 per month as a base salary"—a fact that was largely undisputed.

Guajardo argues that legally sufficient evidence establishes the agreement found by the jury, noting that he testified that the shareholders unanimously agreed that he would be paid $8,000.00 per month, two of the other three shareholders acknowledged this agreement, and Guajardo's bank statement reflected a direct deposit of the net amount of his bi-weekly salary after taxes. But Guajardo directs us to no evidence, and we have found none in the record, that Hitt, Orsak, and Chesnutt ever indicated expressly or by conduct that Guajardo was promised a salary of $8,000.00 indefinitely without regard to whether he continued to work at BDS.

Guajardo's testimony established only that he had worked at BDS since its inception and that he "assumed" that he would continue to have a position at BDS.

13

Even then, Guajardo admitted that there was no express guarantee of employment. "The simple fact that a party has consistently done something in the past does not, standing alone, demonstrate an agreement to continue performing the same act in the future." *Argo Data Res. Corp.*, 380 S.W.3d at 275; *see also Ed Rachal Found. v. D'Unger*, 207 S.W.3d 330, 332 (Tex. 2006) (per curiam) (holding that no evidence supported breach of contract claim by officer and director of foundation based on foundation's agreement to pay him a specific salary when evidence established only his personal understanding of his contract and that it had been annually renewed in the past).

Guajardo's assertion that he was entitled to the $8,000.00 per month even if he ceased working at BDS is not supported by anything other than his subjective belief. But the determination of a meeting of the minds is based on the objective standard of what the parties said and did, not on their subjective state of mind. *Parker Drilling*, 316 S.W.3d at 75; *Baroid Equip*., 184 S.W.3d at 17. Nothing in the Shareholder Agreement suggests that the shareholders were entitled to receive an unanimously agreed-upon salary whether or not they were actively employed at BDS, and there was no evidence that any shareholder ever received a salary while not actively employed.

Guajardo's own evidence contradicts his stated position. During Guajardo's testimony, he was asked whether the use of the word "salary" in the Shareholder Agreement and the Ownership and Asset Purchase Agreement referenced "the assumption of work," and Guajardo answered: "Yes. I mean, we all assumed to work." Guajardo also put in evidence copies of each of the shareholders' Internal Revenue Service Form W-2 Wage and Tax Statements reflecting the amount of wages they earned yearly as "employees" of BDS. Further, Guajardo's claim that he was entitled to a salary even if he did not work at BDS is contrary to the commonly understood

14

meaning of "salary"[4] and is not a reasonable expectation absent a written employment contract. *See Argo Data Res.*, 380 S.W.3d at 266 ("To the extent Shagrithaya expected, however, to maintain a level of compensation equal to Martin's indefinitely regardless of circumstances or his position in the company, we conclude that, without an agreement pertaining to compensation, such an expectation was not reasonable."); *see also Montgomery Cty. Hosp. Dist. v. Brown*, 965 S.W.2d 501, 502 (Tex. 1998) (explaining that for an enforceable employment contract to exist, "the employer must unequivocally indicate a definite intent to be bound not to terminate the employee except under clearly specified circumstances").

Because Guajardo failed to present legally sufficient evidence of an enforceable agreement between Guajardo and Hitt, Orsak, and Chesnutt containing the terms Guajardo alleged, the trial court did not err in granting the defendants' motion for JNOV on his breach of contract claim. *See Ed Rachal Found.*, 207 S.W.3d at 331–32 (explaining that "an agreement to pay at a stated rate is not enough" to demonstrate an agreement to be bound to a specific term of employment); *Argo Data Res.*, 380 S.W.3d at 275 (holding that evidence of an implied agreement between shareholders to receive equal compensation "while they both remained active in the business" was insufficient to support a jury verdict for shareholder on breach of contract claim absent evidence of a meeting of the minds on other material terms); *Stinger*, 830 S.W.2d at 720 (affirming directed verdict on breach of contract claim lacking specific material terms of employment other than anticipated salary). And, absent legally sufficient evidence of an enforceable contract, Guajardo is not entitled to recover breach of contract damages or attorney's fees. *See MBM Fin. Corp. v. Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 666 (Tex. 2009); *Parker Drilling*, 316 S.W.3d at 77–78. We therefore overrule

---

[4] A "salary" is defined as "[a]n agreed compensation for services" that is usually "paid at regular intervals on a yearly basis." BLACK'S LAW DICTIONARY 1537 (10th ed. 2014).

Guajardo's first and second issues as to his breach of contract claim.

## C. The JNOV on Guajardo's Breach of Fiduciary Duty Claims

Guajardo next contends that he is entitled to recover damages based on the jury's findings in his favor on his breach of fiduciary duty claims against Hitt, Chesnutt, and Orsak.

The jury found that Hitt did not comply with his fiduciary duty to BDS and awarded $17,250.00 for bonuses and commissions not determined by unanimous consent. Similarly, the jury found that Chesnutt did not comply with his fiduciary duty to BDS and awarded $34,000.00 for bonuses and commissions not determined by unanimous consent, as well as an additional $20,000.00 in economic loss due to Chicago-related expenditures. Although the jury also found that Orsak did not comply with his fiduciary duty to BDS, the jury found zero damages. Each of the damages questions asked the jury to determine the amount of money that "would fairly and reasonably compensate [BDS] for its damages, if any, that were proximately caused by such conduct."

Hitt, Chesnutt, and Orsak did not challenge the sufficiency of the evidence supporting the jury's findings that they breached their fiduciary duties to BDS. Instead, the defendants moved for JNOV on several other grounds, including the ground that Texas law precludes a personal recovery by Guajardo for a wrong done to BDS.[5]

The general rule in Texas is that "individual stockholders have no separate and independent right of action for injuries suffered by the corporation which merely result in the depreciation of the value of their stock." *Perry v. Cohen*, 285 S.W.3d 137, 144

---

[5] The defendants also moved for JNOV on the grounds that the trial court erred in submitting jury questions about breach of fiduciary duty that did not include any predicate involving the business judgment rule; the jury questions improperly shifted the burden of proof to the defendants; and the damages awards were fatally inconsistent with the amounts Guajardo requested and the evidence presented at trial.

(Tex. App.—Austin 2009, pet. denied) (quoting *Wingate v. Hajdik*, 795 S.W.2d 717, 719 (Tex. 1990)). "Accordingly, an action for such injury must be brought by the corporation, not individual shareholders." *Id.* When a shareholder brings a derivative action on behalf of a closely held corporation, however, the trial court may treat the derivative action as a direct action brought by the shareholder for his own benefit and award recovery directly to the shareholder "if justice requires." *See* Tex. Bus. Orgs. Code § 21.563(c); *Sneed v. Webre*, 465 S.W.3d 169, 181 (Tex. 2015).[6]

On appeal, Guajardo argues that all three of the defendants breached their fiduciary duties and therefore, as he requested in his pleadings and motion for judgment on the jury's verdict, Guajardo is entitled to personally recover the damages awarded. Guajardo does not contend that the trial court erred or offer any substantive argument or authorities to support a conclusion that "justice requires" the trial court in this case to treat his derivative action as a direct action "brought by [Guajardo] for his own benefit" and award him direct damages. *See* Tex. Bus. Orgs. Code § 21.563(c).

As the *Sneed* court explained when discussing the predecessor to section 21.563: "[T]here is not an absolute right for a shareholder [of a closely held corporation] to recover directly for claims based on corporate injuries. Rather, *if justice requires*, a

---

[6] Section 21.563 of the Texas Business Organizations Code provides:

> If justice requires: (1) a derivative proceeding brought by a shareholder of a closely held corporation may be treated by a court as a direct action brought by the shareholder for the shareholder's own benefit; and (2) a recovery in a direct or derivative proceeding by a shareholder may be paid directly to the plaintiff or to the corporation if necessary to protect the interests of creditors or other shareholders of the corporation.

Tex. Bus. Orgs. Code § 21.563(c). It is undisputed that BDS is a closely held corporation. *See* Tex. Bus. Orgs. Code § 21.563(a) (defining "closely held corporation" to mean a corporation with "fewer than 35 shareholders" and "no shares listed on a national securities exchange or regularly quoted in an over-the-counter market by one or more members of a national securities association"). The *Sneed* court noted that its conclusions applied to both section 21.563 and its predecessor found in the former Texas Business Corporations Act. *See* 465 S.W.3d at 177 n.4.

17

court *may* treat a derivative proceeding like a direct action and allow the shareholder to recover directly." *See* 465 S.W.3d at 188 (emphasis added). Our sister courts have recognized that the decision whether justice requires the shareholder to recover directly under this statute is a matter left to the trial court's discretion. *See Saden v. Smith*, 415 S.W.3d 450, 463–65 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (holding that trial court was authorized to permit shareholder of closely held corporation to recover damages for breach of fiduciary duty owed to corporation when shareholder met statutory requirements); *Swank v. Cunningham*, 258 S.W.3d 647, 665 (Tex. App.—Eastland 2008, pet. denied) ("[U]nder Section 21.563(c), the trial court has discretion to award damages in a derivative proceeding directly to the shareholder."); *see also Cardwell v. Gurley*, No. 05-09-01068-CV, 2018 WL 3454800, at *6 (Tex. App.—Dallas July 18, 2018, no pet.) (mem. op.) (holding that similarly worded statute applicable to a closely held limited liability company "gives a trial court discretion" to allow a member of such company to recover directly (citing Bus. Orgs. Code § 101.463(c))).

Guajardo bears the burden to demonstrate that the trial court reversibly erred by refusing to allow him to recover the corporation's damages directly. *See Arias v. Brookstone, L.P.*, 265 S.W.3d 459, 467 (Tex. App.—Houston [1st Dist.] 2007, pet. denied); *Budd v. Gay*, 846 S.W.2d 521, 524 (Tex. App.—Houston [14th Dist.] 1993, no writ). But Guajardo merely makes the conclusory assertion that he is "entitled" to recover directly under section 21.563 without explaining why the trial court's refusal to do so constitutes reversible error. It is not our duty to review the record, research the law, and then fashion a legal argument for an appellant when he has failed to do so. *Canton–Carter v. Baylor Coll. of Med.*, 271 S.W.3d 928, 931–32 (Tex. App.—Houston [14th Dist.] 2008, no pet.). Briefing waiver occurs when a party fails to make proper citations to authority or to the record or provide any substantive legal analysis. *See* Tex.

R. App. P. 38.1(i); *Lowry v. Tarbox*, 537 S.W.3d 599, 611–12 (Tex. App.—San Antonio 2017, pet. denied); *Canton–Carter*, 271 S.W.3d at 932. We conclude that Guajardo has failed to adequately brief any argument in support of this issue, and so has waived the complaint.

Assuming for purposes of argument that Guajardo has not waived this issue, we cannot say the trial court abused its discretion by refusing Guajardo's request that he personally recover for BDS's damages resulting from Chesnutt and Hitt's breaches of their fiduciary duties to BDS. In this case, Guajardo was one of four shareholders, each of whom was entitled to 25% of the corporation's earnings; Guajardo argued different wrongful actions done by different shareholders; and only two of the shareholders were found to have damaged the corporation. Guajardo cites no case in which section 21.563(c) has been applied in such a situation to require the recovery to be paid to "the only [innocent] one." We therefore overrule Guajardo's first and second issues as to his breach of fiduciary duty claims.

In sum, we overrule Guajardo's issues concerning his contract and fiduciary duty claims. Before we may affirm the trial court's judgment, however, we must consider the cross-appeal of Hitt, Chesnutt, and Orsak.

### III. ANALYSIS OF HITT, CHESNUTT, AND ORSAK'S CROSS-APPEAL

In their sole issue, cross-appellants Hitt, Chesnutt, and Orsak assert that the trial court erred by failing to grant attorney's fees to them under the Uniform Declaratory Judgment Act when they prevailed on Guajardo's declaratory judgment action. Cross-appellants "urge this Court to hold that the trial court failed to act in accordance with any guiding rules and principles (i.e., abused its discretion) because there was absolutely no basis to deny the statutorily-authorized attorney's fees for Cross-Appellants' successful defense of the declaratory judgment claim." Further, cross-appellants assert that this court should render a judgment for the full amount of the

19

attorney's fees the jury found was a "reasonable fee for the necessary services" of cross-appellants' attorney.[7]

The record shows that after Guajardo rested, cross-appellants sought a directed verdict on Guajardo's declaratory judgment action. The disputed issue was legal effect, if any, of the document created by the mismatched pages from the Partnership Agreement and Hitt's employment agreement which Chesnutt provided in response to Guajardo's request for company documents. According to cross-appellants, they "had no choice other than to prepare a full defense for that claim through the period from Cross-Appellants' original answer all the way through the trial itself."

During argument on the motion for directed verdict, the parties were willing to stipulate that the Partnership Agreement was "unenforceable and does not exist," although Guajardo's counsel disagreed with the trial court's statement that the Partnership Agreement "has no authority over anything that we are doing here." Cross-appellants contend that this exchange shows that Guajardo "concede[d] the irrelevance" of his declaratory judgment action, and therefore cross-appellants prevailed and are entitled to attorney's fees. But Chesnutt acknowledged during his testimony that prior to trial he had insisted that the pages were not mismatched and that he did not concede that the pages were mismatched until he was questioned at trial. Further, the trial court made no ruling on the declaratory judgment action, and the final judgment recites that "[a]ll relief not expressly granted in this Judgment is denied."

Assuming for purposes of argument that cross-appellants prevailed on Guajardo's declaratory judgment action, their argument nevertheless fails. The Texas Uniform Declaratory Judgments Act provides that courts "may award costs and

---

[7] The jury found that the attorney representing Hitt, Orsak, and Chesnutt was entitled to $30,000.00 for representation in the trial court, $10,000.00 for representation through appeal to the court of appeals, $8,000.00 if a petition for review is filed in the Supreme Court of Texas, and $5,000.00 if there is briefing on the merits in the Supreme Court of Texas.

reasonable and necessary attorney's fees as are equitable and just." Tex. Civ. Prac. & Rem. Code § 37.009. The Act "entrusts attorney fee awards to the trial court's sound discretion, subject to the requirements that any fees awarded be reasonable and necessary, which are matters of fact, and to the additional requirements that fees be equitable and just, which are matters of law." *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998). We review a trial court's decision to award or not award attorney's fees for abuse of discretion. *Ridge Oil Co. v. Guinn Invs., Inc.* 148 S.W.3d 143, 163 (Tex. 2004).

Contrary to cross-appellant's argument, the supreme court has repeatedly confirmed that an award of attorney's fees in a declaratory judgment action "is not dependent on a finding that a party 'substantially prevailed.'" *Morath v. Tex. Taxpayer & Student Fairness Coalition*, 490 S.W.3d 826, 885 (Tex. 2016) (quoting *Barshop v. Medina Underground Water Conservation Dist.*, 925 S.W.2d 618, 637 (Tex. 1996)). As the *Bocquet* court succinctly explained: "The Declaratory Judgments Act does not require an award of attorney fees to the prevailing party. Rather, it provides that the court 'may' award attorney fees. The statute thus affords the trial court a measure of discretion in deciding whether to award attorney fees or not." 972 S.W.2d at 20. In other words, a trial court, in the exercise of its discretion, "may award attorney's fees to the prevailing party, may decline to award attorney's fees to either party, or may award attorney's fees to the nonprevailing party, regardless of which party sought declaratory relief." *Garden Oaks Maint. Org. v. Chang*, 542 S.W.3d 117, 141 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

Cross-appellants point to no evidence to support their claim that they incurred substantial attorney's fees in preparing a defense to the issue, and the record reflects that little trial time was spent on the issue of the mismatched pages. Because cross-appellants are not entitled to attorney's fees merely because they allegedly prevailed

on Guajardo's declaratory judgment action and there is no indication in the record that the trial court's decision was arbitrary or unreasonable, we conclude that the trial court did not abuse its discretion in declining to award attorney's fees to cross-appellants. *See Ridge Oil*, 148 S.W.3d at 163; *Bocquet*, 972 S.W.2d at 20. We overrule cross-appellants' sole issue.

## IV. CONCLUSION

Having overruled the issues of the appellant/cross-appellee and the appellees/cross-appellants, we affirm the trial court's judgment.

/s/    Ken Wise
        Justice

Panel consists of Justices Jamison, Wise, and Jewell.