

# NUMBER 13-24-00380-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

MUELLER SUPPLY COMPANY, INC.
D/B/A MUELLER, INC.,                                                    Appellant,

v.

ARROW SELF STORAGE, LLC,                                               Appellee.

## ON APPEAL FROM THE 36TH DISTRICT COURT
## OF SAN PATRICIO COUNTY, TEXAS

## MEMORANDUM OPINION

**Before Chief Justice Tijerina and Justices West and Cron**
**Memorandum Opinion by Justice West**

In this construction defect case, appellant Mueller Supply Company, Inc. d/b/a Mueller, Inc. (Mueller) provided building fabrication services to appellee Arrow Self Storage, LLC (Arrow). Arrow alleged breach of contract, fraud, negligent

misrepresentation, and violations of the Texas Deceptive Trade Practices Act (DTPA) against Mueller. On liability, the jury found in favor of Arrow on all claims except breach of contract. The jury awarded Arrow the following damages: $285,000 for fraud, $0 for negligent misrepresentation, and $60,000 for mental anguish and $419,391.83 for attorney's fees[1] under the DTPA. By six issues, which we reorganize as four, Mueller argues (1) relief under the DTPA is unavailable to Arrow as a matter of law; (2) nonmaterial statements of inactionable puffing were elicited at trial, precluding Arrow's tort and DTPA recoveries; (3) the economic loss rule precludes Arrow's tort recoveries; and (4) the integration clause in the parties' contract precludes Arrow's tort and DTPA recoveries. We affirm in part and reverse and render in part.

## I.   BACKGROUND

Kelly and Karisa Bowen own Arrow. The Bowens formed Arrow to construct and operate a self-storage facility, consisting of a center building and another building encircling the center building. Arrow obtained a loan of "just under 1.3 million" dollars to complete construction. Kelly acted as the project manager and oversaw several subcontractors that would complete the various scopes of work necessary for project completion. K&W Engineering Solutions (K&W) provided the construction plans for the self-storage facility including plans for the facility's concrete slab foundation. Arrow poured the concrete slab according to the K&W plans, although there was conflicting testimony as to whether Arrow followed the plans perfectly.

## A.    Arrow Contracts with Mueller

### i.    Representations: Compliance with K&W Plans

---

[1] Arrow was also awarded contingent appellate attorney fees.

The first building erector Arrow hired recommended that Arrow use Mueller as its fabricator. Mueller requested a copy of the K&W plans from Arrow to determine whether it could fabricate the building components for Arrow's project. Mueller decided it could do the job. Nathan Williams, Mueller's project management and sales representative, sent a quote and purchase agreement for $294,039 (Purchase Agreement) to Arrow for signature. In an email, Williams stated the following:

> I assure you that we have provided a qualified quote based on the plan pages provided by you. We feel we have configured the building to meet or exceed your needs and look forward to serving you.

At trial, Williams testified as follows:

[Arrow's Counsel]: And the quote that you provided is based on these engineered plans from K&W, correct?

[Williams]: Yes.

[Arrow's Counsel]: And ultimately Arrow Self Storage signed a contract for Mu[e]ller Company to fabricate the building based on the K&W plans, correct?

[Williams]: Yes.

Williams also testified that he and William McQueen, Mueller's branch manager, visited the site and took photographs and measurements of the existing slab. Williams sent emails to a colleague containing photos and measurements of the foundation wherein he stated, "Everything looks okay to me based on our conversation, however, if you notice something out of whack let me know."

Sometime after the foregoing events and after Arrow made a deposit with Mueller, Mueller issued its own plans. Williams clarified the timeline of the foregoing events as follows:

3

> [Arrow's Counsel]: Okay. So I just want to make sure I have the timeline correct. K&W plans provided to Mueller. Mueller issues bid based on K&W plans. And you, Mr. McQueen do a site visit. And then some time after Mueller produces its drawings, its engineered plans?
>
> [Williams]: Correct.

Kelly testified that Williams told him the K&W plans had "to be redrawn in the Mueller software so that the product and the beams and everything could be cut for the project." Kelly testified that based on William's representations and the fact that the K&W plans were the only plans existing when the quote and Purchase Agreement was provided to him, he thought Mueller's plans would duplicate the K&W plans. He further testified that he would not have contracted with Mueller otherwise.

### ii. Representations: Mueller's Experience and Capabilities

Kelly testified that after Mueller decided it could do the job, Williams represented that "they do tons of self[-]storage . . . [t]hey're in that market," "they could start right away" with Arrow's project, it was "right up their alley," and Mueller was "the preferred vender in self[-]storage companies." Kelly also testified that Mueller's website represented that Mueller was a "one stop shop. Materials arrive to site, ready to go, ready to be installed. No field modifications are needed. It did mention . . . the pre[-]punched holes. It mentioned everything is labeled, simple, cut the (sic) length." Kelly further testified that the website represented, "Everything is customized to your need. That it arrives onsite ready to go. Basically[,] a plug and play type of environment." When asked what the website said about pre-punching components, Kelly responded, "It says that they are pre[-]punched ready to go. Everything is to arrive on site ready for inst[a]llation." A pamphlet from Mueller labeled "Self-Storage Buildings by Mueller" was entered into evidence and included similar

4

statements: steel frame components are "[p]re-cut, pre-marked, easy-to-assemble," base angle and base channel are "[p]re-[p]unched," Mueller products are "[d]esigned in-house to your project specifications."

## B.     On-Site Problems

During the erection of Arrow's facility, it became apparent that the Mueller plans differed in several respects from the K&W plans, resulting in necessary field modifications to the building components provided by Mueller. Mueller's plans called for the end wall base plates to sit on a lower ledge of concrete. However, the K&W plans and existing slab did not provide such. As a result, the end wall columns and studs delivered by Mueller were too long and had to be cut in the field.

Moreover, the K&W plans called for a ridge cap at the center building's roof peak, but the Mueller plans just specified metal panel. Mueller's installation manual calls for a peak ridge panel at the ridge, which is a prefabricated metal piece, but that was not provided either. When Arrow reached out to Mueller about the ridge issue, Mueller advised Arrow to fold the metal panel over the ridge. Arrow's expert testified that metal panel is "stiff" and does not bend in the field very well. He further testified that bending metal panel across a ridge would result in "crinkle[s] and deform[ities]," elevations in parts of the panel, and a nonwatertight seal. These effects were borne by Arrow's roof, and Arrow had to install closed cell foam to create a watertight seal.

In addition, the circular building straddled the perimeter of Arrow's property. The City of Ingleside required the roof to slope toward the center building so that all water runoff was diverted onto the Arrow property and not onto neighboring lots. The K&W plans provided accordingly by elevating the roof at the corners of the building. The higher roof

5

would slope onto the lower adjoining roofs that sloped to the center of the Arrow property. The Mueller plans did not include these specifications, resulting in no way to slope the roof at those locations toward the center of Arrow's property. Since Mueller fabricated the building according to its own plans, the columns it provided for the building corners were too short. The building corners had to be torn down and re-erected to maintain a proper slope.

Mueller also delivered nine-foot doors, but the K&W plans called for eight and-a-half-foot doors. Because the foundation was configured for eight and-a-half-foot doors, the nine-foot doors required reconfiguring the door jamb and interfered with the framing at the top of the door. Moreover, the doors Mueller provided were manufactured by a third party. These doors interfered with Mueller's door header design, resulting in the doors catching some of the surrounding metal when they rolled up.

Additionally, the base angle and base channel provided by Mueller were not predrilled or pre-punched. Mueller also provided no specifications for drilling the base channel holes. Arrow's expert testified that Arrow could not drill holes wherever and however it wanted because an engineer must specify such. Kelly testified that, during erection of the building, Arrow and its subcontractors did not know "where those holes were to be punched[,] how the building was to get anchored[,] and how many anchor points" were needed. Arrow ultimately had to drill over 1,900 holes in the field.

Arrow's expert testified that when working from a fabricator's engineered plans, field modifications of prefabricated components are not anticipated. He explained that even Mueller's own warranty terms provide that the warranty is void if prefabricated materials are cut in the field. Arrow's expert testified that Mueller did not coordinate its

6

work with existing slab conditions on Arrow's site. He further testified that Mueller was not used to constructing large, circular buildings like Arrow's. He also testified that Mueller's "software was geared to do standard buildings that were going to be delivered to your property and you were going to build a slab to put them on." However, this situation was unique and involved an already existing slab.

## C.      Mueller Testimony on Experience

Williams testified at trial that he was not aware if the Mueller branch he worked at had ever done a self-storage project before the Arrow project and that the Arrow project was a larger and bigger project than most other projects he has sold. McQueen testified that other than one non-prefabricated mini storage project, he had not worked on a self-storage building before Arrow's.

## D.      Post-trial Procedure

After the jury returned its verdict, Mueller filed a motion for new trial and judgment notwithstanding the verdict, asserting the issues enumerated above. The trial court entered a judgment consistent with the jury's findings and denied Mueller's motion by operation of law. This appeal ensued.

## II.      STANDARD OF REVIEW

When the trial court denies a motion for judgment notwithstanding the verdict, we review the issues (1) de novo if they involve pure questions of law, *Guajardo v. Hitt*, 562 S.W.3d 768, 775 (Tex. App.—Houston [14th Dist.] 2018, pet. denied); *Bank of Am., N.A. v. Barth*, No. 13-08-00612-CV, 2013 WL 5676024, at *2 (Tex. App.—Corpus Christi–Edinburg Oct. 17, 2013, no pet.) (mem. op.), or (2) for legal sufficiency. *Moore Freight Servs., Inc. v. Munoz*, 545 S.W.3d 85, 96 (Tex. App.—El Paso 2017, pet. denied). In de

7

novo review, we exercise our own discretion and grant no deference to the trial court's decision. *Vaughn v. Vaughan*, 710 S.W.3d 412, 418 (Tex. App.—Eastland 2025, pet. denied) (citing *Quick v. City of Austin*, 7 S.W.3d 109, 116 (Tex. 1998)). The test for legal sufficiency is "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). Under this standard, we review "the evidence in the light most favorable to the jury's verdict, indulging every reasonable inference that would support the jury's verdict." *Herrera v. Wendell Legacy Homes, LLC*, 631 S.W.3d 441, 451 (Tex. App.—Beaumont 2021, no pet.). "If there is more than a scintilla of evidence to support the findings, the motion was properly denied." *Union Pac. R.R. Co. v. Est. of Gutierrez*, 446 S.W.3d 478, 484 (Tex. App.—Houston [1st Dist.] 2014, pet. denied). Accordingly, the appellant must demonstrate there is no evidence to support the adverse finding it challenges. *Udall v. Minns*, No. 03-24-00064-CV, 2026 WL 259618, at *13, __ S.W.3d __, __ (Tex. App.—Austin 2026, pet. filed); *Amir-Sharif v. Bostic*, No. 01-15-00697-CV, 2016 WL 7164019, at *2 (Tex. App.—Houston [1st Dist.] 2016, pet. dism'd w.o.j.) (mem. op.).

We review denials of motions for new trial for abuse of discretion. *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 813 (Tex. 2010).

> Abuse of discretion occurs when a trial court fails to correctly analyze or apply the law. The test is whether the trial court acted arbitrarily or without reference to any guiding legal principles. Trial courts are afforded broad discretion in ruling on motions for new trial and its ruling will not be disturbed on appeal absent a showing of an abuse of discretion.

*Said v. Valdes*, 668 S.W.3d 793, 799 (Tex. App.—El Paso 2023, no pet.) (citations omitted).

8

## III.    DTPA

By its first issue, Mueller argues that the jury's awards under the DTPA are barred because the project value exceeds $500,000.[2] *See* Tᴇx. Bᴜs. & Cᴏᴍ. Cᴏᴅᴇ § 17.49(g). Arrow asserts that DTPA relief is available because, while the total construction cost for the storage facility exceeded $500,000, Mueller was only paid $294,039.

"[A] transaction, a project, or a set of transactions relating to the same project involving total consideration by the consumer of more than $500,000" are exempted from the DTPA statute. *Id.* The purpose of this exemption is to ensure the DTPA is a viable source of relief for consumers and remove from its purview litigation of high dollar business transactions. *Murphey v. Old Dollar Props., LLC*, No. 13-19-00530-CV, 2022 WL 324076, at *9 (Tex. App.—Corpus Christi–Edinburg Feb. 3, 2022, pet. denied) (mem. op.); *AES Valves, LLC v. Kobi Int'l, Inc.*, No. 01-18-00081-CV, 2020 WL 1880781, at *5 (Tex. App.—Houston [1st Dist.] Apr. 16, 2020, pet. denied) (mem. op.); *Citizens Nat'l Bank v. Allen Rae Invs., Inc.*, 142 S.W.3d 459, 473 (Tex. App.—Fort Worth 2004, no pet.). While undefined in the DTPA statute, courts have defined "project" as a "planned undertaking." *See Rhino Linings Corp. v. 2X2 P'ship, Ltd.*, No. 05-22-00522-CV, 2024 WL 885117, at *12 (Tex. App.—Dallas Mar. 1, 2024, pet. denied) (mem. op.).

In *Rhino*, 2x2 owned a large warehouse in need of roof repairs. Rhino was a manufacturer of waterproof coatings. *Id*. at *1. A 2x2 representative and a Rhino representative met to discuss 2x2's issue. *Id*. Rhino explained that it did not perform

---

[2] Mueller also attacks the jury's DTPA findings by asserting the professional services exemption precludes recovery, *see* Tᴇx. Bᴜs. & Cᴏᴍ. Cᴏᴅᴇ § 17.49(c), and there could be no breach of warranty under DTPA because the parties' contract disclaimed warranties. Because we find DTPA relief was precluded on other grounds, we need not address these issues. *See* Tᴇx. R. Aᴘᴘ. P. 47.1.

roofing work but merely supplied roofing products. *Id*. Rhino recommended that 2x2 use a roof applicator by the name of Mastersson. *Id.* 2x2 contracted to pay Mastersson $507,050 for seven categories of work, including a gutter and downspout system and skylight. *Id.* at 11. The cost of the Rhino products used was less than $500,000. *Id.* At the conclusion of Mastersson's work, a warranty agreement was signed between 2x2 and Rhino related to the Rhino products used on 2x2's building. *Id.* at 1. Thereafter, 2x2's roof began leaking more than it previously did, and 2x2 asserted a DTPA claim against Rhino. *Id.* Our sister court found the DTPA claim was barred because, although Rhino's products that went into 2x2's building were less than $500,000, the "planned undertaking" encompassed the entire agreement 2x2 had with Mastersson. *Id.* at 12. The court further opined that while the agreement with Mastersson "contemplates a series of transactions, some directly involving Rhino's products and some involving products manufactured and sold by other[s,] . . . . [the] transactions are not unrelated. On the contrary, together they represent a single project: renovation of 2x2's roof." *Id.*

In *Murphey*, Smith purchased a mobile home park and feed store from Murphey. 2022 WL 324076, at *1. In one transaction, the land was sold for $700,000. *Id.* at *2. In another transaction, the water and septic systems were sold for $300,000. *Id.* Disputes arose over Murphey's pre-sale representations regarding the functionality and capacity of the septic system. *Id.* at *2–3. Smith asserted a DTPA claim against Murphey. *Id.* at *8–9. We found the DTPA claim was barred because, although the septic system was purchased in a sale involving less than $500,000, such was part of a project or set of transactions involving purchase of the entire mobile home park and feed store for $1,000,000. *Id.* at *9.

10

In the present case, Arrow was building a facility to operate a storage rental business. Kelly testified that he hired various professional subcontractors to perform different scopes of work related to construction of the storage unit facility. Moreover, Kelly managed, scheduled, and coordinated communication between the subcontractors. When asked if the aggregate payment remitted to the various trades he hired exceeded $500,000, Kelly responded "I believe so." He further testified that Arrow's construction loan was for "just under 1.3 million" dollars, and those funds were not used for anything other than the construction of Arrow's facility. Given such, we find the *project* or *planned undertaking* was the construction of a storage unit facility that Arrow could use to operate a storage rental business. *See Rhino Linings Corp.*, 2024 WL 885117, at *12; *Murphey*, 2022 WL 324076, at *9. Because the total consideration for the planned undertaking exceeded $500,000, Arrow was not entitled to relief under its DTPA claim as a matter of law. *See* TEX. BUS. & COM. CODE § 17.49(g); *Wolfcreek Mins., LLC v. Warren Power & Mach., L.P.*, No. 07-24-00056-CV, 2025 WL 2266750, at *6 (Tex. App.—Amarillo Aug. 7, 2025, no pet.) (mem. op.) (explaining that determination of the application of the DTPA $500,000 exemption was "a matter of law"); *Murphey*, 2022 WL 324076, at *9 (treating satisfaction of the DTPA $500,000 exemption as a purely legal question); *Miller v. Kim Tindall & Assocs., LLC*, 633 S.W.3d 102, 105 (Tex. App.—San Antonio Aug. 18, 2021, pet. denied) (holding questions of consumer status under DTPA are legal questions); *Guajardo*, 562 S.W.3d at 775 (applying de novo review to purely legal questions). Accordingly, the trial court erred by granting judgment in favor of Arrow on its DTPA claim.

We sustain Mueller's first issue.

11

## IV.    MATERIALITY

By its second issue, Mueller argues the following are immaterial statements of inactionable puffing: (A) statements from Williams that Mueller "had 'done tons of self[-]storage,' that Arrow's project was 'right up their alley,' that Mueller was a 'preferred vendor in self[-]storage companies,'" and (B) statements on Mueller's website describing its self-storage fabrication capabilities as "'a one stop shop,' with a 'plug and play' product that is 'customized to your need' and 'arrives onsite and ready to go.'"

However, Arrow alleged other misrepresentations that Mueller apparently does not contend to be inactionable puffing but could also support a finding of fraud and negligent misrepresentation, including that Mueller represented that it would do the job in accordance with the K&W plans, and the quote and Purchase Agreement was "based on" the K&W plans. In other words, Mueller has failed to show that the alleged inactionable puffing caused the rendition of an improper judgment. *See Visa Inc. v. Sally Beauty Holdings, Inc.*, 651 S.W.3d 278, 307 (Tex. App.—Fort Worth 2021, pet. denied) (explaining that "even if we were to hold that the two [challenged] statements could not support a fraud claim, such a holding would not entirely negate the actionable-representation element of fraud" because petitioner's "fraud claim was not limited to the two statements" challenged).

Moreover, we disagree that the complained-of statements are immaterial and thus inactionable. To prove fraud, a claimant must show that a *material* representation was made. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011). "Material means a reasonable person would attach importance to and would be induced to act on the information in determining his choice of actions in the transaction

12

in question." *Id*. (internal quotations omitted). Generally, pure expressions of opinion fail the materiality requirement. *Id.* at 337–38. However, an expression of opinion can satisfy the materiality requirement when the party making the representation has special knowledge such that the facts underlying the opinion are not equally available to the other party. *Id.* at 338 (collecting cases).

To the extent the complained-of statements convey that Mueller regularly fabricated self-storage facilities and had substantial past experience doing such, a reasonable person would be induced to act upon such statements when deciding whether to hire Mueller to fabricate components for a self-storage facility. *See id.* at 337. Despite these representations, Williams testified that he could not recall his Mueller branch ever fabricating a self-storage project before Arrow's, and McQueen testified he only had experience with one self-storage project before Arrow's. Thus, the representations at issue are not pure expressions of opinion but contain averments of fact. *See id.* at 339. (classifying as a statement of fact a representation made during lease negotiations of a restaurant facility that "no problems" had been experienced with the facility when there were prior instances of a foul sewer odor). Finally, even assuming the statements were pure expressions of opinion, Mueller's one-sided knowledge of its lack of experience in self-storage fabrication made these representations actionable under the circumstances. *See id.*

Thus, indulging all inferences in favor of the jury's verdict, we find the evidence was sufficient for the jury to determine that the representations made by Mueller were material representations about its type of business and past experience. *See Herrera*, 631 S.W.3d at 451.

We overrule Mueller's second issue.

## V. ECONOMIC LOSS RULE

By its third issue, Mueller argues the tort damages awarded by the trial court are barred by the economic loss rule because the damages are purely economic and the same damages Arrow sought on its breach of contract claim.

We agree the economic loss rule generally "precludes recovery in tort for economic losses resulting from a party's failure to perform under a contract when the harm consists only of the economic loss of a contractual expectancy." *Bell v. Bay Area RV Parks, L.L.C.*, 722 S.W.3d 176, 212 (Tex. App.—Houston [1st Dist.] 2025, no pet.). However, claims for fraudulent inducement are not barred by the economic loss rule even if the damages sought are purely economic and could also be recovered under a breach of contract theory. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 304 (Tex. 2006) (stating "[t]he duty not to fraudulently procure a contract arises from the general obligations of law rather than the contract itself, and may be asserted in tort even if the only damages are economic"); *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998) (providing "tort damages are recoverable for a fraudulent inducement claim irrespective of whether the fraudulent representations are later subsumed in a contract or whether the plaintiff only suffers an economic loss related to the subject matter of the contract"); *Reservoir Sys., Inc. v. TGS-NOPEC Geophysical Co., L.P.*, 335 S.W.3d 297, 308 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (explaining that it is "well established that the legal duty not to fraudulently procure a contract is separate and independent from the duties established by the contract itself"); *Yeldell v. Goren*, 80 S.W.3d 634, 637 (Tex. App.—Dallas 2002, no pet.) (explaining that

14

"[a]llowing the recovery of fraud damages sounding in tort only when a plaintiff suffers an injury that is distinct from the economic losses recoverable under a breach of contract claim is inconsistent with this well-established law and also ignores the fact that an independent legal duty, separate from the existence of the contract itself, precludes the use of fraud to induce a binding agreement"); *Crundwell v. Becker*, 981 S.W.2d 880, 883 (Tex. App.—Houston [1st Dist.] 1998, pet. denied) (explaining that "tort damages *are* recoverable for a fraudulent inducement claim, even if the damages are the same as those recoverable under the breach of contract claim").

Fraudulent inducement is a species of fraud, carrying the same elements but arising in the context of a contract. *Reservoir Sys., Inc.*, 335 S.W.3d at 302; *Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018); *Silverberg v. Tex. Com. Bank, N. A.*, No. 01-95-00564-CV, 1996 WL 350534, at *3–4 (Tex. App.—Houston [1st Dist.] 1996) (mem. op., not designated for publication) (finding a claim was for fraudulent inducement even though it was merely labelled "FRAUD" in the petition), *on reh'g*, No. 01-95-00564-CV, 1998 WL 608336 (Tex. App.—Houston [1st Dist.] 1998, no pet.) (mem. op., not designated for publication). Here, Arrow pled a claim for fraud and specifically pled, "Arrow relied on these various statements and misrepresentations made by Mueller in entering into the Contract and paying Mueller $294,039.00." Thus, Arrow asserted a fraudulent inducement claim, allowing recovery of purely economic damages that could also be recovered under a breach of contract theory. *See Eagle Oil & Gas Co. v. Shale Expl., LLC*, 549 S.W.3d 256, 268 (Tex. App.—Houston [1st Dist.] 2018, pet. dism'd) (providing that the economic loss rule's application to tort recovery is a legal question); *Guajardo*, 562 S.W.3d at 775 (applying de novo review to purely legal questions).

15

We overrule Mueller's third issue.[3]

## VI. INTEGRATION CLAUSE

By its fourth issue, Mueller argues that the integration clause in the Purchase Agreement precludes Arrow's recovery under fraudulent inducement. The integration clause provides in relevant part: "This writing is intended by the parties as a final expression of their agreement, and it is intended also as a complete and exclusive statement of the terms of their agreement."

The Texas Supreme Court has held that an integration clause, "standing alone, does not prevent a party from suing for fraudulent inducement." *Int'l Bus. Mach. Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 229 (Tex. 2019). In contrast, "a clause that clearly and unequivocally expresses the party's intent to disclaim reliance on the specific misrepresentations at issue can preclude a fraudulent-inducement claim." *Id.* However, "[n]ot every such disclaimer is effective, and courts must always examine the contract itself and the totality of the surrounding circumstances when determining if a waiver-of-reliance provision is binding." *Id.* (internal quotations omitted). Under a factors analysis, we evaluate whether:

---

[3] Within its economic loss doctrine argument, Mueller appears to argue that the jury could not have made a fraudulent inducement finding because it also found that Arrow did not breach the Purchase Agreement despite finding the Purchase Agreement included agreements to construct Arrow's facility in accordance with the K&W plans and existing foundation. To the extent Mueller asserts an issue that there is a fatal conflict among the jury's answers, it failed to preserve such issue by raising it before the jury was released. *Los Compadres Pescadores, L.L.C. v. Valdez*, 622 S.W.3d 771, 787 (Tex. 2021) (providing that "a party who claims that jury answers fatally conflict must raise that objection with the trial court before the court discharges the jury, so that the court can correct the error by providing additional instructions and retiring the jury for further deliberations"); *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 517 (Tex. 2018); *Izen v. Comm'n For Lawyer Discipline*, 322 S.W.3d 308, 324 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (providing "[t]o preserve error that the jury's findings are inconsistent, the complaining party must raise an objection in the trial court before the jury is discharged").

> (1)    the terms of the contract were negotiated, rather than boilerplate, and during negotiations the parties specifically discussed the issue which has become the topic of the subsequent dispute;
>
> (2)    the complaining party was represented by counsel;
>
> (3)    the parties dealt with each other at arm's length;
>
> (4)    the parties were knowledgeable in business matters; and
>
> (5)    the release language was clear.

*Id.* "When sophisticated parties represented by counsel disclaim reliance on representations about a specific matter in dispute, such a disclaimer may be binding, conclusively negating the element of reliance in suit for fraudulent inducement." *Id.* (internal quotations omitted).

Here, the parties agreed to a generic integration clause. It does not specifically address any misrepresentation, much less those at issue in this case. Regarding the factors, Mueller did not address them in its brief. However, we note the integration clause appears to be a boilerplate provision as it refers to Mueller by name while referring to Arrow as "Buyer," and it is located within the Purchase Agreement bearing Mueller's letterhead on most of the pages. *San Antonio Props., L.P. v. PSRA Invs.*, 255 S.W.3d 255, 262 (Tex. App.—San Antonio 2008) (holding a provision was boilerplate where it referred to the parties as "Buyer and Seller"), *review granted, judgment vacated, and remanded by agreement*, No. 08-0518, 2008 WL 11535925 (Tex. Dec. 5, 2008). The parties have not addressed whether disclaimer of the specific representations at issue was discussed at the time of contracting. The parties have not addressed whether either party was represented by counsel at the time of contracting. The parties have not addressed whether they dealt with each other at arm's length. The parties have not

17

addressed their knowledge of business matters; however, the parties appear to be knowledgeable in business matters so far as Mueller is a steel fabricator business, and Arrow is a storage rental business. The generic release language was clear.

Considering the foregoing, we find the parties' generic integration clause does not preclude Mueller's liability under a fraudulent inducement theory for the misrepresentations asserted by Arrow. *See id.*; *Pelco Constr. Co. v. Chambers County*, 495 S.W.3d 514, 529 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) (explaining that where an integration clause provided the "Contract represents the entire and integrated agreement . . . and supersedes prior . . . representations . . . either written or oral," the clause was "standard" and could not defeat a tort claim); *San Antonio Props.*, 255 S.W.3d at 262 (holding that a generic and boilerplate integration clause could not bar a fraudulent inducement claim); *see also Sanchez v. Barragan*, 624 S.W.3d 832, 839 (Tex. App.—El Paso 2021, no pet.) (providing contract construction is a question of law); *Guajardo*, 562 S.W.3d at 775 (applying de novo review to purely legal questions).

We overrule Mueller's fourth issue.

### VII.    CONCLUSION

We reverse the trial court's award of mental anguish damages and attorney fees under Arrow's DTPA claim and render judgment that Arrow take nothing on said claim. The trial court's judgment is affirmed in all other respects.

JON WEST
Justice

Delivered and filed on the
21st day of May. 2026.

18